**John INGLE, Appellant (Defendant below),**

v.

**STATE of Indiana, Appellee (Plaintiff below).**

No. 22S00–9611–DP–724.

Supreme Court of Indiana.

May 8, 2001.

Michael J. McDaniel, McDaniel & Betteau, New Albany, IN, Attorney for Appellant.

Jeffrey A. Modisett, Attorney General of Indiana, Andrew L. Hedges, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

SULLIVAN, Justice.

Defendant John Ingle shot his estranged wife to death in a restaurant where she worked, then fired on a police officer as he attempted to escape. He was convicted of murdering and attempting to kidnap his wife and attempting to murder the police officer. We affirm the murder and attempted murder convictions.

Defendant was sentenced to death for the murder. Indiana law permits a death sentence only if the State proves beyond a reasonable doubt that one or more "aggravating circumstances" specified by the legislature exist. Here, the State charged that Defendant killed his wife while attempting to take her hostage and while "lying in wait." We find that the State proved neither and so a death sentence is not permitted under Indiana law.

## Background

The evidence at trial showed that Defendant John Ingle was upset that his wife, Debbie Ingle, had left him. On the evening of July 26, 1996, Defendant went to Debbie's place of employment, Tommy Lancaster's Bar, and threw a brick through the windshield of her car. On the morning of the 27th, Defendant watched from a concealed position as the police arrived to take a report from Debbie. After the police left, Defendant went and purchased clothes to use as a disguise. Defendant then returned to Tommy Lancaster's. When he walked in, Debbie immediately recognized him and she shouted for someone to call the police. As Debbie ran behind a counter, Defendant shot her. Five bullets struck Debbie, killing her.

Defendant then left the bar, concealing his gun. As he fled toward the Ohio River, he was soon confronted by Officer Russell Witt. He refused to comply when Officer Witt ordered him to lie down. When Officer Witt sprayed Defendant with mace to force him to comply, Defendant fired the remaining shots in his gun. One of the bullets struck the patrol car and four struck Officer Witt; three hit his protective vest and one went up his right arm into his chest, seriously injuring him.

A jury found Defendant guilty of Murder,[1] Attempted Murder,[2] a Class A felony, and Attempted Kidnapping, a Class A felony.[3] Alleging two aggravating circumstances, Murder committed by lying in wait[4] and Murder while Attempting Kidnapping,[5] the State sought a sentence of death. The jury recommended death and the court sentenced Defendant to death. Additional sentences of 50 years for at-

tempted kidnapping and 50 years for the attempted murder were imposed.

Additional facts will be provided as necessary.

## DISCUSSION

### I

■ Defendant contends that his killing of Debbie Ingle constituted voluntary manslaughter rather than murder. He states, "events over the several weeks prior to the homicide merely support a factual basis which would cause an ordinary person to lose control...." Appellant's Br. at 44–45. When Defendant entered the bar and approached Debbie, she identified him and shouted for someone to call the police. Defendant contends that this incited his passions "to the extent it prevented deliberation." *Id.* at 44.

■ A person commits voluntary manslaughter when the person "knowingly or intentionally kills another human being while acting under sudden heat." Ind. Code § 35–42–1–3(a) (1993). Sudden heat is a mitigating factor that reduces what otherwise would be murder. *Id.* § 35–42–1–3(b). Sudden heat occurs where provocation engenders rage, resentment, or terror sufficient to obscure the reason of an ordinary person, preventing deliberation and premeditation, excluding malice, and rendering a person incapable of cool reflection. *See Wilson v. State,* 697 N.E.2d 466, 474 (Ind.1998), *reh'g denied; Powers v. State,* 696 N.E.2d 865, 868 (Ind.1998).

■ Defendant states that he "placed the issue of sudden heat in the evidence," and "the prosecution bears the ultimate burden of negating any defense which is sufficiently raised by the defendant." Ap-

1. Ind.Code § 35–42–1–1 (1993).

2. *Id.* §§ 35–41–5–1 and 35–42–1–1.

3. *Id.* §§ 35–41–5–1 and 35–42–3–2.

4. *Id.* § 35–50–2–9(b)(3).

5. *Id.* § 35–50–2–9(b)(1)(E).

pellant's Br. at 43 (quoting *Wolfe v. State*, 426 N.E.2d 647, 652 (Ind.1981)).

We agree with that proposition but find that the State's evidence rebutted Defendant's sudden heat defense. As discussed under *Background, supra,* Defendant vandalized Debbie's car, waited for the police to leave, attempted to disguise himself, walked into the bar, and then opened fire when Debbie tried to run behind the counter. This evidence is sufficient for a jury to conclude that Defendant was not provoked and that his actions were deliberate. Defendant may well have been enraged that Debbie shouted for someone to call the police, but this is not "sufficient provocation" to establish sudden heat. It is predictable that one would call out for the police or for some kind of help when assaulted by a person with a gun. The prosecution sufficiently rebutted the Defendant's claim of sudden heat.

## II

■ Defendant contends that he was entitled to have the jury instructed that it could convict him of attempted voluntary manslaughter, rather than attempted murder of Officer Witt, asserting that the officer's actions "engendered the rage, terror and anger which factually justify a finding of sudden heat." Appellant's Br. at 47.

When Defendant was intercepted by New Albany police officer Russell Witt during his flight toward the Ohio River after killing Debbie, he refused to comply when Officer Witt twice ordered him to lie on the ground. Officer Witt maced Defendant, who responded by shooting Officer Witt.

■ Defendant was not entitled to an attempted voluntary manslaughter instruction on these facts. We addressed the same argument in *Spranger v. State*, 650 N.E.2d 1117 (Ind.1995), *reh'g denied:*

Because citizens have a duty to submit to a lawful arrest by a law enforcement officer, such an arrest will not be recognized as legally adequate to provoke the passions of an ordinary person to sudden heat so as to justify a conviction for the lesser offense of manslaughter.

*Id.* at 1122.

Defendant acknowledges that the officer's actions were "quite lawful and performed during an arrest." Appellant's Br. at 48. As such, they cannot be the basis for a sudden heat defense. The trial court correctly refused to instruct the jury on attempted voluntary manslaughter.

## III

Defendant next contends that the trial court erred in denying his requests for disqualification of the prosecuting attorney and for the appointment of a special prosecutor.

The basis of Defendant's claim stems from the relationship between Defendant's younger brother, Gordon Ingle, and the prosecuting attorney, Stanley Faith. Gordon, a lawyer, worked under Faith as a deputy prosecuting attorney between January 1, 1987, and July, 1989, and as a volunteer deputy until January, 1991. Gordon and Faith remained friends after Gordon stopped working at the prosecutor's office.

Gordon, Faith, and a mutual friend, James Hancock, had lunch together on the day before the killings, and Defendant was discussed in the conversation. The trial court probed the nature and substance of the conversation at a hearing on Defendant's motion to require the State to disclose all possible bases for the disqualification of the prosecuting attorney. Gordon testified that he could only "recall saying something to the effect that there was [going to] be a homicide/suicide in Floyd County." Hancock testified during the

same hearing that the tenor of the conversation was that Defendant was out of control and that he "was going to do something." Hancock further testified that he did not recall any specific comments that Faith made during the conversation, but that Faith "indicated ... that he was aware that there was a protective order in effect and basically that from a ... law enforcement standpoint, that was probably all that could be done at that point."

Faith's presence at the conversation was never disclosed to the jury. Nevertheless, Defendant argues that the court should have granted his motion to disqualify Faith and appoint a special prosecutor; that Faith failed to disclose the extent of his personal knowledge of the conversation, resulting in prejudice to the Defendant; and that Defendant was incorrectly barred from calling Faith as a witness, frustrating Defendant's right to present a defense. We find, for reasons discussed below, that the trial court did not err in shielding Faith from testifying, and that there was no resulting prejudice to Defendant.

A

■ Defendant sought to call Faith as a witness to testify regarding his recollection of the conversation between Faith and Gordon in which Gordon discussed Defendant's state of mind. Defendant argues that Faith's recollection of the conversation would relate to the issue of Defendant's state of mind and would have therefore contributed to his defense.

■ Ordinarily, counsel is not subject to being called as a witness. *See* *Chatman v. State*, 263 Ind. 531, 545, 334 N.E.2d 673, 682 (1975). We stated in *Matheney v. State*, 583 N.E.2d 1202 (Ind.) *cert. denied*, 504 U.S. 962, 112 S.Ct. 2320, 119 L.Ed.2d 238 (1992):

As a general rule, a prosecuting attorney cannot be called as a defense witness unless the testimony sought is required by compelling and legitimate need. The trial court in its discretion may deny the request if the prosecutor does not have information vital to the case. Where the evidence is easily available from other sources and absent "extraordinary circumstances" or "compelling reasons," an attorney who participates in a case should not be called as a witness.

*Id.* at 1206 (quotations in original) (citations omitted).

We see no basis for concluding that Faith had any information that was not easily available from other sources and, therefore, that the court properly shielded him from testifying. Any information Faith may have had would have stemmed from his conversation with Gordon regarding Defendant's mental state; there is no contention that Faith had any personal knowledge of Defendant's mental health. Had there been useful information discussed during the conversation, Hancock or Gordon could have testified to it.

B

■ Defendant claims that "the State's failure to disclose the personal knowledge of Faith concerning the conversation creates the strong inference that the information withheld was favorable to Defendant and this constitutes a violation of the [*Brady*] disclosure rule." In *Brady v. Maryland*, the United States Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Here, however, Defendant knew of

the lunchtime conversation prior to the trial, as evidenced by the fact that, before the trial, he filed a motion to disqualify Faith based on the conversation. In addition, there is no evidence that the State failed to disclose any evidence of material value regarding Faith's conversation with Gordon. There is no basis to find a *Brady* violation.

## C

Defendant contends that his right to present a defense was frustrated by the court order barring him from calling prosecutor Faith as a witness. Defendant cites *Crane v. Kentucky* for the proposition that "the Constitution guarantees criminal defendants 'a meaningful opportunity to present a completed defense.'" 476 U.S. 683, 690, 106 S.Ct. 2142, 90 L.Ed.2d 636 (1986) (quoting *California v. Trombetta,* 467 U.S. 479, 485, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984)). Defendant claims that his inability to call Faith as a witness deprived him of the opportunity to present a defense: "[T]he presence of Faith at the luncheon conversation would impact the jury." Appellant's Br. at 56.

The exclusion of Faith as a witness did not prevent Defendant from presenting a defense. Hancock testified that the "tenor of the conversation was that [Defendant] was out of control." *Id.* Faith had no personal knowledge of Defendant's state of mind and there is no indication that Faith could have bolstered Defendant's defense. We see no basis for concluding that the jury would have decided differently had it known of Faith's involvement in the conversation. Defendant had ample opportunity to present a defense, including evidence regarding his mental state.

## D

Defendant contends that his motion to disqualify Faith and appoint a spe-cial prosecutor should have been granted by the trial court. The appointment of a special prosecutor in Indiana is governed by Indiana Code § 33–14–1–6 (Supp.1996). Indiana Code § 33–14–1–6(b)(2) provides:

A circuit or superior court judge ... may appoint a special prosecutor if:

(A) a person files a verified petition requesting the appointment of a special prosecutor; and

(B) the court, after:

(i) notice is given to the prosecuting attorney; and

(ii) an evidentiary hearing is conducted at which the prosecuting attorney is given an opportunity to be heard;

finds by clear and convincing evidence that the appointment is necessary to avoid actual conflict of interest or there is probable cause to believe that the prosecutor has committed a crime.

In the present case, Defendant filed a petition under Indiana Code § 33–14–1–6(b)(2) requesting a special prosecutor. The judge reviewed motions and heard oral arguments as required by that statute. The judge also heard the testimony of Gordon Ingle and James Hancock in a motion to compel discovery hearing. The judge then denied Defendant's motion to disqualify the prosecuting attorney, finding no conflict of interest or crime committed by the prosecutor.

Defendant does not appear to contend that the trial court's decision not to appoint a special prosecutor violated the statute. Rather, he argues that prosecutors should also be subject to disqualification for violations of standards of ethical conduct, a circumstance he contends that the statute does not embrace. Defendant maintains that it would be anomalous if "[t]he only way a trial court may remove a prosecutor where the appearance of impro-

priety exists is when the prosecutor agrees to the appointment of a special prosecutor." Appellant's Br. at 58.

Defendant argues that prosecutors are more than mere advocates of the State and are charged with maintaining fairness and justice in the judicial system. Defendant cites the Comment to Rule 3.8 of Indiana's Rules of Professional Conduct which states, "A prosecutor has the responsibility of a minister of justice and not simply that of an advocate. This responsibility carries with it specific obligations to see that the defendant is accorded procedural justice and that guilt is decided upon the basis of sufficient evidence." Defendant also cites Rule 8.4 which provides in part, "it is professional misconduct for a lawyer to . . . engage in conduct that is prejudicial to the administration of justice." Ind. Professional Conduct Rule 8.4. Defendant further cites a statement by the United States Supreme Court that "the United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interests, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done." *Berger v. United States,* 295 U.S. 78, 88, 55 S.Ct. 629, 79 L.Ed. 1314 (1935).

The implication of these citations appears to be that the court should disqualify a prosecutor who does not live up to these standards even though the prosecutorial disqualification statute does not provide a mechanism for appointing a special prosecutor in such circumstances. Be that as it may, we see nothing in the record suggesting that Faith violated any ethical duties here. Nor do we see anything in the record that suggests the trial court was incorrect in finding no disqualifying conflict of interests or probable cause to be-

lieve the prosecutor committed any crime. We affirm the trial court's decision not to disqualify Faith.

## IV

■ Defendant contends that the evidence at trial was insufficient to sustain his conviction for the attempted kidnapping of Debbie.

The State presented evidence that Defendant went into the bar with the intent of confining Debbie to convince her to return to him. Most damning was Defendant's statement that he "was going to try and kidnap [Debbie]." State's Exhibit No. 15.

### A

"A person attempts to commit a crime when, acting with the culpability required for commission of the crime, he engages in conduct that constitutes a substantial step toward commission of the crime." Ind. Code § 35–41–5–1(a) (1993). The legislature has set forth the elements of kidnapping as follows:

(a) A person [commits kidnapping by] knowingly or intentionally confin[ing] another person: (1) with intent to obtain a ransom; (2) while hijacking a vehicle; (3) with intent to obtain the release, or intent to aid in the escape, of any person from lawful detention; or (4) with intent to use the person confined as a shield or hostage.

(b) A person [commits kidnapping by] knowingly or intentionally remov[ing] another person, by fraud, enticement, force, or threat of force, from one place to another: (1) with intent to obtain ransom; (2) while hijacking a vehicle; (3) with intent to obtain the release, or intent to aid in the escape, of any person from lawful detention; or (4) with intent

to use the person removed as a shield or hostage.

*Id.* § 35–42–3–2.

Therefore, under the law, a defendant is guilty of attempted kidnapping if—but only if—each of the following is proven beyond a reasonable doubt:

1.  The defendant knowingly or intentionally engages in conduct that constitutes a substantial step towards at least one of the following:

    a.  Confining another person; or

    b.  Removing another person, by fraud, enticement, force, or threat of force, from one place to another.

2.  In engaging in that conduct, defendant intended to do at least one of the following:

    a.  Obtain ransom;

    b.  Hijack a vehicle;

    c.  Obtain the release, or aid in the escape, of any person from lawful detention; or

    d.  Use the person confined as a shield or hostage.

It is undisputed that Defendant intentionally engaged in conduct that constituted a substantial step toward removing Debbie by force or threat of force from one place to another. It is also undisputed that Defendant did not engage in this conduct with intent to obtain a ransom; while hijacking a vehicle; with intent to obtain the release or to aid the escape of any person from lawful detention; or with intent to use Debbie has a shield. Therefore, in order for Defendant to be guilty of attempted kidnapping, the State was required to prove beyond a reasonable doubt that Defendant engaged in this conduct with intent to use Debbie as a hostage.

The State's theory was that Defendant was attempting to remove Debbie by force from the bar to convince her to reconcile with him and that this constituted his attempting to make her his "hostage." Defendant contends that a person is only a "hostage" if the person has been confined or removed by the abductor to secure an act or forbearance from a third party. The evidence is undisputed that Defendant was trying to secure something from Debbie only her promise to return to him and not from a third party. For this reason, Defendant argues, Debbie was not a "hostage" and there is a failure of proof on an essential element of the crime.

### B

■ The success of Defendant's claim depends, therefore, on whether the Legislature meant the kidnapping statute to apply when the abductor's only goal is to get a *third party* to do or not do something or also to apply when the abductor's goal is to get the *victim* to do something or not do something.

■ As we have noted before, the Legislature has not defined the term "hostage." *Bartlett v. State,* 711 N.E.2d 497, 501 (Ind.1999). To determine its meaning, we attempt to ascertain and give effect to the intent of the Legislature. *Id.* Two aspects of the way in which the Legislature has written our criminal code indicate to us that Defendant's reading of the statute is correct.

First, the Legislature has created another, different, crime—criminal confinement—that covers the situation where a perpetrator abducts a victim in order to induce some act or forbearance on the victim's part. The Legislature has set forth the elements of the crime of criminal confinement as follows:

A person [commits criminal confinement] who knowingly or intentionally:

(1) confines another person without the other person's consent; or

(2) removes another person, by fraud, enticement, force, or threat of force, from one place to another.

Ind.Code § 35–42–3–3 (1993). The crime of criminal confinement is clearly a lesser included offense of kidnapping. But if the term "hostage" encompasses a victim confined or removed by a perpetrator for no purpose beyond inducing some act or forbearance on the part of the victim alone, every act of criminal confinement would constitute a hostage-taking. This is because the force or coercion exercised in a criminal confinement always induces an act or forbearance on the part of the victim; at the very least, the victim is induced to submit and cooperate in the confinement.

While it is conceivable that the Legislature intended to have both the crimes of criminal confinement and kidnapping cover the same situation, we believe it is more likely that the Legislature did not intend for kidnapping to apply to the situation where the abductor's only goal is to get the victim to do or not do something. Rather, we believe the Legislature intended for kidnapping to apply to those more aggravated situations where the abductor intends for third persons to become involved.

A second aspect of the way in which the Legislature has written our criminal code supports this conclusion.

The four subsections of the kidnapping statute each refer to scenarios where a victim becomes a tool in the abductor's plan. First, in subsections (1) and (3) of § 35–42–3–2, the ransom or the release of a person lawfully confined are ultimate goals, and the victim confined is merely a pawn in the larger scheme; in a hijacking under subsection (2), transportation is usually the ultimate objective; and it is clear that a shield under subsection (4) is used to ward off some independent force. These subsections all suggest situations in which a neutral captive is taken as the means to obtain a separate primary end. Given the meaning of the other subsections of § 35–42–3–2, a consistent definition of hostage would refer to one who is taken to secure some separate demand from another party.

### C

The State cites our decision in *Bartlett v. State*, 711 N.E.2d 497 (1999), to support its view of the meaning of hostage. In *Bartlett*, the defendant Bartlett took two victims, Michael and Barr, captive. Among the crimes of which Bartlett was convicted were the kidnappings of both Michael and Barr. On appeal, Bartlett challenged the conviction of the kidnapping of Michael. The facts of the case showed that at various points during the criminal episode in question, Bartlett had held a weapon on Barr while requiring Michael to perform certain acts. We found that Bartlett's actions amounted to the kidnapping of Michael as well as Barr, stating, "so long as a defendant detains a person as security for the performance of a demand during the course of a kidnapping, the detainee is a hostage for the purposes of our kidnapping statute." *Id.* at 501.

The State argues that Defendant's actions in this case were consistent with those found to constitute the kidnapping of Michael in *Bartlett*. Though we acknowledge that the language from *Bartlett* quoted above appears to support the State's argument, the full decision in *Bartlett* supports the alternative view.

The defendant in *Bartlett* argued that "Barr, and not Michael, was the hostage because Bartlett ... procured the compliance of Michael by pointing the gun at Barr." *Id.* at 501. We decided that both Michael and Barr could be hostages at the same time, stating, "In multiple hostage

**938**

situations, it is entirely possible that a threat against one or more of the hostages may be used to obtain the compliance of *others*, sometimes simultaneously." *Id.* (emphasis added). Our reference to "others" was meant to indicate that in the case of hostages, demands are made to third parties; *Bartlett* was a situation where the third party with respect to each victim was the other victim.

Other language in *Bartlett* supports this view. In concluding that Michael was a hostage, we stated, "Michael was clearly held captive for the purpose of *ensuring that Barr continued to comply* with Bartlett's demands. This explicitly occurred when Bartlett trained the gun on Michael and *ordered Barr to drive*." *Id.* (emphasis added). In fact, most of the analysis in *Bartlett* would have been unnecessary under the State's view of "hostage." We held in *Bartlett* that both victims were "hostages" because each was used to obtain the compliance of the other. *Id.* Under the State's view of "hostage," there would have been no question that Michael and Barr were hostages because each one was held by force to secure his and her own compliance respectively. There would have been no need to inquire as to whether one hostage was held to secure the compliance of the other.

## D

This definition of the word "hostage" is consistent with that given it in other states that have similar kidnapping statutes. In *State v. Crump*, 82 N.M. 487, 484 P.2d 329 (1971), New Mexico's Supreme Court overturned a kidnapping conviction, defining "hostage" for the purposes of their kidnapping statute to mean: "the unlawful taking, restraining or confining of a person with the intent that the person, or victim, be held as security for the performance, or forbearance, of some act by a third person." *Id.* at 335. In *State v. Moore*, 315 N.C. 738, 340 S.E.2d 401 (1986), a case with similar facts to this one, the North Carolina Supreme Court adopted New Mexico's definition.[6] *Id.* at 406.

In *State v. Stone*, 122 Ariz. 304, 594 P.2d 558 (App.1979), the Arizona Court of Appeals confronted a similar question. The defendant in *Stone* was a prisoner who escaped from a hospital by taking two people captive at gunpoint. Like Indiana, Arizona's kidnapping statute refers to one who intends to "hold or detain ... any individual ... as a shield or hostage...." *Id.* at 562. The Arizona Court of Appeals distinguished between a person held as security for an act or forbearance by a third party, and those held to coerce the detainee. The court found that the captives were not "hostages," because there was no "evidence that appellant intended to hold or detain either of his victims as security for the performance, or the forbearance, of some act by a third person." *Id.* at 563.[7]

6. The defendant in *Moore* abducted his estranged wife after waiting for her in the parking lot outside her job and took her back to his trailer. When the police arrived, Defendant refused to give up or release his wife " 'unless they could promise him he would not go to jail.' " *Moore*, 340 S.E.2d at 407 (quotation in original). The Court found that the initial abduction was not a kidnapping, stating, "[I]n determining whether the evidence in the instant case supports a finding that the defendant intended to hold his wife as a hostage, we do not consider evidence of his attempts to coerce her to come back to him." *Id.* at 406. According to the Court, however, the victim *became* a hostage when the "defendant confined the victim as security for prevention of his arrest by law enforcement authorities and to extract from them a promise that he would not go to jail." *Id.* at 407.

7. The Arizona Supreme Court, however, upheld the kidnapping conviction because it found that the defendant intended to use the victims as "shields against interference or in-

## E

■ We hold that the term "hostage" in the Indiana kidnapping statute, Indiana Code § 35–42–3–2 (1993), refers to a person who is held as security for the performance or forbearance of some act by a third party. To the extent such a person is held solely to secure demands upon that person alone, the perpetrator may be guilty of criminal confinement, Indiana Code § 35–42–3–3 (1993), but not kidnapping.

We further hold that there is insufficient evidence to find that Defendant committed attempted kidnapping because there is no evidence that he intended to take Debbie hostage. During an interview with the police, Defendant stated that he "was going to try and kidnap her." [8] State's Exhibit No. 15. Defendant also stated during the trial that he was trying to get Debbie to return to him. A reasonable jury could infer from the evidence that Defendant intended to confine Debbie and demand her return, but there is no evidence that he intended to make any demands on a third party. We conclude that Defendant never intended to take Debbie hostage and, consequently, could not have been attempting to kidnap her.

## V

■ In a murder case, the State may seek either a death sentence or a sentence of life imprisonment without parole by alleging the existence of at least one of the aggravating circumstances listed in Indiana Code § 35–50–2–9(b). Among the constitutional and statutory requirements for imposing a death sentence, the State must prove the existence of at least one aggravating circumstance beyond a reasonable doubt. *See Bellmore v. State,* 602 N.E.2d 111, 127 (Ind.1992), *reh'g denied; Davis v. State,* 477 N.E.2d 889, 892 (Ind.), *cert. denied* 474 U.S. 1014, 106 S.Ct. 546, 88 L.Ed.2d 475 (1985).

The State charged two aggravating circumstances in this case: Murder while attempting kidnapping and murder while lying in wait. We have upheld the death penalty in other domestic violence murders. *See Wrinkles v. State,* 690 N.E.2d 1156 (Ind.1997) (upholding death penalty where the defendant killed his wife and her brother and sister-in-law), *cert. denied,* 525 U.S. 861, 119 S.Ct. 148, 142 L.Ed.2d 121 (1998); *Baird v. State,* 604 N.E.2d 1170 (Ind.1992) (upholding a death sentence of a defendant who killed his wife, his mother, and his father), *cert. denied,* 510 U.S. 893, 114 S.Ct. 255, 126 L.Ed.2d 208 (1993); *Matheney v. State,* 583 N.E.2d 1202 (Ind.) (affirming death penalty of a defendant who killed his former wife), *cert denied,* 504 U.S. 962, 112 S.Ct. 2320, 119 L.Ed.2d 238 (1992). But applicable constitutional and statutory law requires proof beyond a reasonable doubt of at least one aggravating circumstance listed in Indiana Code § 35–50–2–9(b) to support a death sentence. Because the facts do not support either of the aggravating circumstances charged, we cannot affirm the death penalty.

## A

Indiana Code § 35–50–2–9(b)(1)(E) (Supp.1996), provides that the State may seek the death sentence or a sentence of life imprisonment without parole by alleg-

terception by the police." *Stone,* 594 P.2d at 564. Unlike Defendant in this case, the defendant in *Stone* directed his captives to walk in front of him so that he could make it past the police. *Id.* at 563.

8. Defendant's reference to "kidnapping" may reveal his intent based on his understanding of the term, but it does not influence the meaning of the statute.

ing that the "defendant committed the murder by intentionally killing the victim while ... attempting to commit ... kidnapping." As stated in Part IV, *supra*, there is insufficient evidence to find that Defendant attempted to kidnap Debbie. As such, existence of the aggravating circumstance of intentional murder while attempting kidnapping has not been proven beyond a reasonable doubt.

### B

Defendant also contends that the State failed to prove the aggravating circumstance of lying in wait beyond a reasonable doubt. *See* Appellant's Br. at 38.

Early on the morning of the killing, Defendant threw a brick through the windshield of Debbie's car, which was parked outside of Tommy Lancaster's. Defendant, concealed in a nearby tree, watched as Debbie arrived and spoke to the police about the incident. After the police left and Debbie went into the pub, Defendant hid his gun in a nearby tree and left. Defendant walked to a nearby campsite to get a ride to Goodwill where Defendant purchased clothing that he could use as a disguise. Defendant's friend then dropped him off a few blocks from Tommy Lancaster's and Defendant went to retrieve his gun from the tree. Soon afterward, Defendant walked into the pub and approached Debbie. As Defendant approached Debbie, she called out for someone to call the police, at which point, Defendant shot Debbie.

■ Lying in wait involves the elements of "watching, waiting, and concealment from the person killed with the intent to kill or inflict bodily injury upon that person." *Davis*, 477 N.E.2d at 896; *Matheney*, 583 N.E.2d at 1208. The concealment must be used "as a direct means to attack or gain control of the victim," *Davis*, 477 N.E.2d at 897, creating a nexus

between the watching, waiting, and concealment and the ultimate attack.

■ In this case, Defendant did watch, wait, and conceal himself outside of Tommy Lancaster's, but his concealment at that time did not constitute any part of murder by lying in wait. The evidence does show that Defendant waited for Debbie to arrive at her car, and he watched Debbie speak to the police, but Defendant did not use his concealment in the tree as a means to attack Debbie. Instead, he left the scene to walk to the nearby campsite and then rode with his friend to Goodwill. Because Defendant did not use his concealment as a "direct means to attack or [to] gain control of the victim," and a substantial amount of time passed between his concealment in the tree and the killing, it does not contribute to the charge of lying in wait.

In this respect, this case resembles *Davis*, where we found that the defendant did not commit a murder by lying in wait. *See Davis*, 477 N.E.2d at 897. The defendant in *Davis* watched and waited from a concealed position, but "did not use the concealment as a direct means to attack or gain control of the victim." *Id.* Instead, the defendant went openly into the victim's tent and forced him to go with him by use of a deadly weapon. The Court found that "[t]here was not a sufficient connection between the concealment and the murder ... to support a finding that [the] murder was committed by 'lying in wait.'" *Id.* (quotation in original).

■ Though his watching and waiting in the tree did not constitute lying in wait, we must also determine whether Defendant's disguise and final assault fulfill the requirements of lying in wait.

■ We have characterized lying in wait as a crime in which:

[T]here is considerable time expended in planning, stealth and anticipation of the appearance of the victim while poised and ready to commit an act of killing. Then when the preparatory steps of the plan have been taken and the victim arrives and is presented with a diminished capacity to employ defenses, the final choice in the reality of the moment is made to act and kill.

*Thacker v. State,* 556 N.E.2d 1315, 1324–25 (Ind.1990). Though Defendant was disguised, he did not watch for the victim, nor did he wait. Rather, Defendant walked to where he thought Debbie would be and approached her directly. Defendant's actions could reasonably lead a jury to presume deliberation and forethought, yet they do not fit our legal definition of lying in wait.

### *Conclusion*

We affirm Defendant's convictions of murder and attempted murder. We reverse Defendant's conviction of attempted kidnapping. And we reverse Defendant's sentence of death because there was insufficient evidence of the existence of either of the aggravating circumstances charged by the State. We therefore remand to the trial court for resentencing to a term of years in accordance with applicable law.

SHEPARD, C.J., and DICKSON, BOEHM, and RUCKER, JJ., concur.