MARK M. HAIRSTON, Appellant-Defendant,
v.
STATE OF INDIANA, Appellee-Plaintiff.
No. 02A04-0602-CR-94.
Court of Appeals of Indiana.
December 14, 2006.
ZACHARY A. WITTE, Fort Wayne, ATTORNEYFOR APPELLANT.
STEVE CARTER, Indiana Attorney General of Indiana GARY DAMON SECREST, Deputy Attorney General, Indianapolis, Indiana, ATTORNEYS FOR APPELLEE.

MEMORANDUM DECISION
FRIEDLANDER, Judge.
Mark M. Hairston was convicted of Kidnapping,[1] a class A felony, Aiding Criminal Deviate Conduct,[2] a class B felony, Dealing in Cocaine,[3] a class B felony, Possession of Cocaine,[4] a class C felony, Aiding Battery,[5] a class C felony, and Battery,[6] a class A misdemeanor. The jury also determined that Hairston was a habitual offender and a repeat sexual offender. The trial court sentenced Hairston to maximum and consecutive terms of imprisonment for each conviction, with the kidnapping sentence enhanced by 30 years for being a habitual offender and the deviate conduct sentence enhanced by 10 years for being a repeat sexual offender, for an aggregate sentence of 147 years. Hairston appeals his kidnapping and criminal deviate conduct convictions, as well as his aggregate sentence. He presents the following restated issues for review:
1. Did the State present sufficient evidence to support the kidnapping conviction?
2. Did the State present sufficient evidence to support his conviction for aiding criminal deviate conduct?
3. Is his sentence inappropriate?
We affirm.
The facts most favorable to the convictions reveal that J.W., a crack addict, was held against her will for multiple days in Hairston's home.[7] During this time, she was sexually assaulted and beaten and allowed to leave the home only to cash bad checks. She was also forced to stay in a small cubbyhole under the basement stairs for much of the time.
On Saturday, March 19, 2005, upon Hairston's request, J.W. went to his home to pay a debt owed by an acquaintance of J.W.'s, for which Hairston held J.W. responsible. J.W. took her friend Ben Szink, and there were several others at the house upon their arrival including, among others, Hairston, Ford, Bobby Freeman, and James Leshore. After paying the debt, J.W. and Szink stayed and smoked crack cocaine with others at the house. Later that night, Hairston informed J.W. that her debt was not paid and she was not allowed to leave. While the subsequent chronology of events and specific details are somewhat sketchy, it is clear that J.W. was held captive and victimized in Hairston's home for the next several days.
At some point, J.W. was provided with a checkbook belonging to Kimberly Springer, who was Freeman's girlfriend. Freeman had taken the checkbook, as well as Springer's vehicle, without her permission and given it to Hairston. On multiple occasions, Hairston ordered J.W. to write bad checks at local stores to obtain cigarettes, beer, and cash in order to pay her debt. Apparently, Freeman was to receive thirty percent of the proceeds from the cashed checks and J.W. was to receive seventy percent, which she was required to pay to Hairston. She was escorted and closely watched by others during each outing. Hairston warned J.W. to return to the house within a certain period of time or she "would pay for it." Transcript at 241. She believed this to mean Hairston would beat her up if she did not comply.
On Monday afternoon, J.W. attempted to cash more checks at Hairston's request and, on at least one occasion, the transaction was cancelled and the merchant retained the check. When Hairston learned of the lost check upon her return, he smacked J.W. in the head and then ordered Freeman to beat her. Freeman took J.W. into the laundry room and struck her in the face multiple times. Upon their return to Hairston's bedroom, Hairston told Freeman to hit her again because "[h]e didn't do a good enough job". Id. at 244. Freeman then punched J.W. in the face several more times, which caused J.W. to bleed and suffer severe pain. Thereafter, Hairston ordered J.W. into a small cubbyhole[8] under the stairs that could be covered with a wooden panel. He also informed her that she owed $100 for losing the check.
J.W. was only allowed out of the cubbyhole to be sexually assaulted as directed by Hairston. J.W. was forced to have sex with Freeman and several other men while she was being held captive. Hairston also made J.W. perform oral sex on Szink, while Hairston watched. At trial, J.W. explained, "You didn't tell [Hairston] no." Id. at 248. If she had, he would have made her "pay for it." Id. at 246.
Hairston told J.W. at some point during this ordeal that she would be released if she could get someone to pay him $100. She was made to call Tom Hall, her daughter's father, to ask for the money. Hall was either unable or unwilling to do so. She then had Leshore call her friend Ricardo Jones to ask for the money, but Jones did not take her seriously. She tried to call one other person but could not get through.
Around 5:45 on Tuesday morning, J.W. was driven to a grocery store to cash another check and buy cigarettes. For the first time, J.W. was told to go into the store alone, as Freeman and a woman J.W. knew as Red waited for her in the parking lot. Her face was badly beaten, though she had attempted to cover it with makeup, and she had blood on her clothes and hair. Upon entering the store, J.W. immediately went to the customer service area for help. During her frantic 911 call, J.W. identified herself as Kimberly Springer[9] and reported that she had been held for two days and had been raped, beaten, and "whored [] out". Transcript of Exhibits at 1 (State's Exhibit 1). She repeatedly stated that they[10] would kill her if they knew she was calling the police. J.W. pleaded for the police to hurry, as Freeman was waiting for her outside and would soon come to get her. J.W. was clearly terrified for her life, and she explained to the operator that she had been threatened that they would make bail and then find and kill her if she did something like this.
Once the police arrived, they took Freeman into custody and Red directed them to Hairston's home, where the rapes had reportedly occurred. Leshore granted the officer entry into the home, and the officers encountered Hairston unclothed and in his bed in the basement. Hairston had a large rock of cocaine in his immediate possession. There was also a crack pipe, handcuffs, and a baseball bat near the bed. In addition to other drug paraphernalia, the officers located the cubbyhole described by J.W. in her statement to officers at the scene. Inside the cubbyhole, police found J.W.'s underwear and socks and a tissue with her blood on it.
J.W. was initially taken to the emergency room for treatment of her facial injuries, which included a broken nose. She was then examined by a sexual assault nurse. Subsequent DNA testing supported J.W.'s claim that she had had sexual contact with Freeman and at least three or four other men during the period in question.[11]
On March 29, 2005, the State charged Hairston with kidnapping (Count I), two counts of criminal deviate conduct (Counts II and III), aiding criminal deviate conduct (Count IV), dealing in cocaine (Count V),[12] possession of cocaine (Count VI), aiding battery (Count VII), and battery (Count VIII). Soon thereafter, the State filed informations alleging that Hairston was a habitual offender and a repeat sexual offender. Prior to trial, Counts II and III were dismissed upon motion by the State. Hairston's four-day jury trial commenced on December 12, 2005. The jury found Hairston guilty of each remaining count and found him to be a habitual offender and a repeat sexual offender. On February 6, 2006, the trial court sentenced Hairston to the following maximum terms of imprisonment for each conviction: Count I, 50 years enhanced by 30 years for being a habitual offender; Count IV, 20 years enhanced by 10 years for being a repeat sexual offender; Count V, 20 years; Count VI, 8 years; Count VII, 8 years; and Count VIII, 1 year. The court ordered all of the terms to run consecutively, for an aggregate sentence of 147 years. Hairston appeals his convictions for kidnapping and aiding criminal deviate conduct,[13] as well as his aggregate sentence. Additional facts will be provided as necessary.

1.
Hairston initially challenges the sufficiency of the evidence with respect to his conviction for kidnapping. In this regard, he claims the State presented no evidence that he "knowingly or intentionally confined [J.W] or that [he] intended for third persons to become involved." Appellant's Brief at 14.
Our standard of review for sufficiency claims is well settled. We neither reweigh the evidence nor assess the credibility of the witnesses. Overstreet v. State, 783 N.E.2d 1140 (Ind. 2003). Rather, we look to the evidence most favorable to the judgment and draw reasonable inferences therefrom. Id. The conviction will be upheld if there is substantial evidence of probative value from which the trier of fact could have found the defendant guilty beyond a reasonable doubt. Id. In other words, we will not substitute our judgment for that of the trier of fact, and the claim of insufficient evidence will prevail only if no reasonable trier of fact could have found Hairston guilty beyond a reasonable doubt. See Ritchie v. State, 809 N.E.2d 258 (Ind. 2004).
In the instant case, the State alleged in the charging information that sometime between March 19 and March 22, 2005, Hairston knowingly or intentionally confined J.W. with the intent to obtain ransom. The kidnapping statute provides in relevant part:
A person who knowingly or intentionally confines another person:
(1) with intent to obtain ransom;
(2) while hijacking a vehicle;
(3) with intent to obtain the release, or intent to aid in the escape, of any person from lawful detention; or
(4) with intent to use the person confined as a shield or hostage; commits kidnapping, a Class A felony.
I.C. § 35-42-3-2(a). Hairston was charged under I.C. § 35-42-3-2(a)(1).
Hairston first contends the State presented no evidence that he knowingly or intentionally confined J.W. He implies that J.W. willingly complied with his requests in order to pay off her debt. He claims there is no evidence he prevented her from leaving. Further, he notes that if she was confined, she was presented with numerous opportunities to escape. Thus, Hairston asserts that during the period in question, J.W. must not have felt she was being confined. His arguments are without merit.
J.W. clearly testified that Hairston did not permit her to leave the residence except, at his direction, to cash bad checks under close supervision and within a time limit. The evidence further reveals that Hairston forced J.W. to stay in a small cubbyhole under the basement stairs. Moreover, Hairston informed J.W. that she would not be released until he was paid $100.[14] The fact that J.W. may have had opportunities to escape on her other check-writing outings is not relevant. As her frantic 911 call reveals, J.W. was terrified for her life and reluctant to defy Hairston's demands. J.W. further indicated to the 911 operator that she had been held for two days, during which time she had been raped and beaten. The evidence clearly supports a finding that Hairston knowingly or intentionally confined J.W.
Hairston next argues that even if he confined J.W., there is no evidence he intended third persons to become involved. Thus, he appears to argue that he should have been charged with criminal confinement rather than kidnapping.
Hairston directs us to Ingle v. State, 746 N.E.2d 927 (Ind. 2001), where our Supreme Court[15] stated:
[W]e believe it is more likely that the Legislature did not intend for kidnapping to apply to the situation where the abductor's only goal is to get the victim to do or not do something. Rather, we believe the Legislature intended for kidnapping to apply to those more aggravated situations where the abductor intends for third persons to become involved.
Id. at 937. We observe that the issue in Ingle concerned the definition of hostage and whether the victim had been used as a hostage. Id. at 939 (holding that the term "hostage" in the kidnapping statute "refers to a person who is held as security for the performance or forbearance of some act by a third party"). In the instant case, however, Hairston was convicted under the ransom provision of the statute, not the hostage provision. See I.C. § 35-42-3-2(a) (1) and (4). While the language quoted above would appear to apply in this context as well, we need not decide the issue because there is evidence in the record that Hairston involved third persons in his demand for money.
Specifically, the evidence reveals that J.W. asked Leshore to call her friend Ricardo Jones, whose nickname was Yakoo. J.W. testified on direct examination by the State in relevant part as follows:
Q All right. And to your knowledge, did [Leshore] call Yakoo?
A He said he did.
Q All right. And what did you want Yakoo to do for you?
A Get me out of there.
Q Okay. And do you know how Yakoo was suppose to get you out of there?
A Pay a hundred dollars.
Q Okay. And who said that if Yakoo paid a hundred dollars you could leave?
A [Hairston].
Q Okay. Did Yakoo come and pay a hundred dollars for your release?
A No he didn't. Nobody would.
Transcript at 252-53. J.W. further testified on cross-examination:
Q Okay. Now...and again, I...I had a real difficult time hearing you when I was sitting over there so...um...were you made to call anybody that weekend to ask for money?
A Yes.
Q And who did you call?
A Tom Hall.
Q Tom Hall who is not an ex-husband, but the father of your child, correct?
A Yes.
Q And you were...you asked Tom to give you money so that you would be able to go?
A Right.
Q And he was not willing or unable to do that?
A Right.
Q Who else did you call?
A Yakoo.
* * *
Q And you asked Yakoo for money?
A Yes.
Q And did Yakoo, was he unwilling or unable to bring you the money?
A He didn't take me seriously.
Q I'm sorry.
A He didn't take it seriously.
Q Anybody else you were...you called or were told to call to ask for money?
A I called somebody else but I don't remember who it was. I didn't get an answer and that was my last call.
Id. at 301-02. In light of J.W.'s testimony, a reasonable trier of fact could determine that Hairston confined J.W. with the intention of obtaining a ransom from a third party. Thus, sufficient evidence supports his conviction for kidnapping.

2.
Hairston also challenges the sufficiency of the evidence supporting his conviction for aiding criminal deviate conduct.[16] He claims there was no evidence presented that he used force or imminent threat of force to compel J.W. to perform oral sex on Szink.
The pertinent language of the criminal deviate conduct statute states: "A person who knowingly or intentionally causes another person to perform or submit to deviate sexual conduct when...the other person is compelled by force or imminent threat of force... commits criminal deviate conduct". I.C. § 35-42-4-2(a)(1).
It is the victim's perspective, not the assailant's, from which the presence or absence of forceful compulsion is to be determined. Tobias v. State, 666 N.E.2d 68, 72 (Ind. 1996). This is a subjective test that looks to the victim's perception of the circumstances surrounding the incident in question. The issue is thus whether the victim perceived the aggressor's force or imminent threat of force as compelling her compliance. Id.

Ruth v. State, 706 N.E.2d 257, 258-59 (Ind. Ct. App. 1999).
In the instant case, J.W. clearly testified that she did not engage in sexual deviate conduct with Szink willingly. Rather, Hairston "made [her] do it", while he watched. Transcript at 246. J.W. explained that Hairston would have "ma[d]e [her] pay for it" if she refused his demands. Id. In other words, J.W. believed she would have been beaten if she refused. Under the circumstances, this was not an unreasonable belief. To be sure, the evidence favorable to the convictions reveals that J.W. was not only under threat of violence during her captivity, she was actually brutally beaten and sexually assaulted on multiple occasions at the direction of Hairston. There was certainly evidence of forceful compulsion from which the jury could reasonably conclude that Hairston committed criminal deviate conduct.

3.
Finally, Hairston challenges the aggregate sentence of 147 years imposed by the trial court. As set forth above, he received maximum and consecutive terms of imprisonment for each conviction. Hairston asserts the sentence is inappropriate in light of the nature of his offenses and his character.
We have the constitutional authority to revise a sentence if, after consideration of the trial court's decision, we conclude the sentence is inappropriate in light of the nature of the offense and character of the offender. Ind. Appellate Rule 7(B); Corbin v. State, 840 N.E.2d 424 (Ind. Ct. App. 2006). "We recognize, however, the special expertise of the trial courts in making sentencing decisions; thus, we exercise with great restraint our responsibility to review and revise sentences." Scott v. State, 840 N.E.2d 376, 381 (Ind. Ct. App. 2006), trans. denied.
With respect to the nature of the offenses, Hairston notes that he received the maximum allowable sentence and then baldly states, "Bobby Freeman was charged with the same crimes as the defendant and received a 20 year executed sentence per plea agreement." Appellant's Brief at 20. We observe that there is no support in the record for this statement regarding the charges filed against Freeman and the ultimate disposition of his case. Moreover, we cannot agree with Hairston's implied assertion that he was somehow less culpable than Freeman with respect to the crimes against J.W. The record reveals J.W. was confined in Hairston's home upon his whim. She was then terrorized for several days, with Hairston personally directing her beatings and multiple sexual assaults. When J.W. was not being beaten, sexually assaulted, or compelled to cash bad checks, Hairston forced her to stay in a small cubbyhole under his basement stairs. While Freeman was certainly an actor in Hairston's play, the record reveals that Hairston controlled and directed J.W.'s fate during the period in question.[17]
Turning to the character of the offender, we note our review is hampered because Hairston, while including pages of extraneous information, did not include the presentence investigation report in his appendix. The record, however, plainly reveals that Hairston has an extensive criminal history, which even he described at the sentencing hearing as "ugly". Sentencing Transcript at 27. The following comments by the trial court shed specific light on his criminal history and character:
Court does find aggravating circumstances with your criminal record covering a rather lengthy period of time, almost twenty (20) years. Twenty-nine (29) misdemeanor convictions. Five (5) prior felony convictions. Multiple opportunities were granted to you to rehabilitate yourself. You were given suspended sentences in Misdemeanor and Felony Court. Given probation, which was apparently revoked at some point. Parole. In 1985 a Misdemeanor conviction for Gambling. 1985, Disorderly Conduct. 1986, Disorderly Conduct, Possession of Marijuana, Physical Resisting Law Enforcement, Fleeing, Resisting Law Enforcement. 1987, Battery in two (2) counts. Again in 1987, another Battery, another Resisting Law Enforcement. You've indicated that you're not a violent person. Just those convictions themselves indicate otherwise. 1988, Criminal Conversion. 1988, Criminal Conversion. 1988, Criminal Conversion, Battery, suspended sentences were revoked in February of 1988. In April of 1988, Disorderly Conduct. Another Criminal Conversion. Another Battery in 1988. You graduate, two (2) [sic] felonies in 1989 with Theft, as a Class D Felony. You were given suspended prison time, probation, a fine and costs. Three months later you were convicted of Battery and Public Intoxication. In July of '89, another Battery and Disorderly Conduct. In 1990 you were unsatisfactorily released from the first felony conviction. Released from probation. In 1989, a C Felony Robbery. Commitment to the Department of Correction, partial commitment. And discharged from DOC in November of 1994. Placed on probation which was apparently revoked in 1995. You were placed back in the Department of Corrections on the Robbery and then released to parole January of 1996. In February of 1996, Public Intoxication. July of 1996, Sexual Battery, your second felony, third felony. Excuse me. In July of '96, apparently with that conviction there was a parole violation. You were returned to the Department of Corrections. Ultimately discharged from the Department of Corrections some three months later and released to parole. 1998, Resisting Law Enforcement, physical. 1998, Felony Theft. Again, releases to parole, suspended sentences revoked. Declared delinquent by parole in December of 1999, and convicted of Operating While Intoxicated in December of 1999. In 2000, False Informing, suspended sentences were revoked in May of 2000 and placed in the local jail. May of 2000, another Domes...well, another Battery, this one denoted as a Domestic Battery, Possession of Marijuana, Resisting Law Enforcement. Another parole violation in February of 2001. Released to parole in July of 2001 and ultimately discharged from parole in December of 2001. April of 2002, you were convicted of Possession of Cocaine or Narcotic Drug, a D Felony. Placed partially in the Department of Corrections and then released to probation in June of 2002. A month later, probation's filing a Petition to Revoke your probation, which was revoked in August, and you were committed to the Department of Corrections for three (3) years. In January of 2004, Unauthorized Absence from Home Detention in Misdemeanor Court. Discharged from DOC in September of 2004. And sometime during the period of time between March 19th and 22nd, 2005, you committed the offenses that you have been convicted of by this jury. Quite an impressive collection of misdemeanors and felonies. And I don't know what else it is that the system is expected to do Mr. Hairston. Probation, suspended sentences, parole. It appears that you have an extremely difficult time conforming your conduct to society's rules. You have expressed remorse here in Court. I'll accept that as a mitigating circumstance, that if the victim were here, which she is not, that you would apologize to her, and you have apologized to your family. Who I'm sure sits and listens to this Court's recitation of your criminal record, surprised by the depth and breadth of your criminal record. [The State's counsel] is correct. The Court's [sic] of Appeals and the Supreme Court have indicated that the trial courts are to reserve maximum sentences for the worst offenders. I sat and listened, Mr. Hairston, to the evidence that was presented at your trial. I understand you are claiming that you are innocent and that you did not do the things that the jury convicted you of. I understand also that you intend to appeal your convictions, so I would just note that the maximum sentence is reserved for the worst offenders, and I find, based on the evidence that I heard and your extensive criminal record, that you are one of the worst offenders that this Court has seen....
Id. at 30-33 (emphases supplied).
While there is no doubt Hairston's aggregate sentence is severe, we do not disagree with the trial court's finding that Hairston is among the worst of the worst. In light of the horrific nature and circumstances of the crimes committed against J.W. and Hairston's well-documented criminal character, his sentence is not inappropriate.
Judgment affirmed.
KIRSCH, C.J., and RILEY, J., concur.
NOTES
[1] Ind. Code. Ann. § 35-42-3-2(a)(1) (West 2004).
[2] I.C. § 35-42-4-2(a)(1) (West 2004); Ind. Code Ann. § 35-41-2-4 (West 2004).
[3] Ind. Code Ann. § 35-48-4-1 (West, PREMISE through 2006 2nd Regular Sess.).
[4] I.C. § 35-48-4-6 (West, PREMISE through 2006 2nd Regular Sess.).
[5] I.C. § 35-42-2-1 (West, PREMISE through 2006 2nd Regular Sess.); I.C. § 35-41-2-4.
[6] I.C. § 35-42-2-1.
[7] Hairston shared the home with Mabel Ford. Ford lived on the main floor, and Hairston occupied the basement. Both Ford and Hairston dealt drugs out of the home.
[8] The cubbyhole was also described in the record as a solid wood cage. The area was about two feet wide and two feet deep, while the height was angled to follow the pitch of the stairs. The average height was approximately three feet.
[9] J.W. continued to identify herself as Kimberly Springer to the responding officers and treatment providers. During a second interview later that day, however, she provided Detective Kenneth Clement with her true name. She was still "very much afraid" of retribution at that time. Id. at 828.
[10] J.W. referred generally to "they" throughout the call. She made clear, however, that Red (the woman in the car with Freeman) was not involved and knew nothing about what was happening. J.W.'s later statements to police, as well as her testimony at trial, reveal that "they" refers to Hairston and Freeman.
[11] Hairston was excluded as a DNA contributor in the items tested from the sexual assault kit.
[12] This charge arose from a controlled buy of crack cocaine from Hairston, which occurred in Hairston's bedroom around 11:00 a.m. on Monday, March 21, 2005.
[13] Hairston does not challenge his convictions for dealing in cocaine, possession of cocaine, aiding battery, or battery.
[14] Even Hairston indicates there was evidence to the effect that J.W. was required to "pay her way out" (that is, by cashing checks and/or obtaining funds from others). Appellant's Brief at 16.
[15] Both Hairston and the State incorrectly indicate that this court issued the opinion in Ingle. This is an especially critical mistake for the State, which argues that Ingles was incorrectly decided and invites us to decline to follow the decision. See Appellee's Brief at 6 ("this Court should decline to follow its [sic] decision in Ingles").
[16] While the record indicates Hairston was convicted of aiding criminal deviate conduct, we observe it is more accurate to state that Hairston was convicted of criminal deviate conduct. Whether as an accomplice or the principal, he was guilty of criminal deviate conduct. See Hampton v. State, 719 N.E.2d 803, 807 (Ind. 1999) ("statute governing accomplice liability does not establish it as a separate crime, but merely as a separate basis of liability for the crime charged").
[17] It even appears that Hairston attempted to control J.W. from jail. While being held on the pending charges, Hairston had a fellow inmate with phone privileges call Peaches, Hairston's sister, to make sure "that girl" had not shown up for her deposition earlier that day. Transcript of Exhibits at 30 (State's Exhibit 34). Hairston, via the inmate, further told Peaches that his trial was in twenty-one days and that she should "put the clamps on her" one or two days before trial to make sure she did not show for trial. Id. Peaches responded that Hairston's brother was taking care of that and everything was under control.