Danny MEANS, Appellant–Petitioner,

v.

STATE of Indiana, Appellee–
Respondent.

No. 49A02–0308–PC–742.

Court of Appeals of Indiana.

May 6, 2004.

Transfer Denied July 8, 2004.

Hilary Bowe Ricks, Indianapolis, IN, Attorney for Appellant.

Stephen R. Carter, Attorney General of Indiana, Cynthia L. Ploughe, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

RATLIFF, Senior Judge.

### STATEMENT OF THE CASE

Petitioner–Appellant Danny Means appeals his convictions of attempted murder, a Class A felony (Ind.Code § 35–42–1–1; Ind.Code § 35–41–5–1); kidnapping, a Class A felony (Ind.Code § 35–42–3–2); conspiracy to commit robbery, a Class B felony (Ind.Code § 35–41–5–2; Ind.Code 35–42–5–1); robbery, a Class B felony (Ind.Code § 35–42–5–1); criminal confinement, a Class B felony (Ind.Code § 35–42–3–3); resisting law enforcement, a Class D felony (Ind.Code § 35–44–3–3); and carrying a handgun without a license, a Class A

misdemeanor (Ind.Code § 35–47–2–1). Means also appeals the denial of his petition for post-conviction relief.

We affirm.

## ISSUES

Means raises four issues for our review, which we restate as:

I. Whether the trial court committed fundamental error in instructing the jury regarding attempted murder and accomplice liability on the issue of specific intent.

II. Whether the trial court erred in refusing to instruct the jury regarding the lesser included offense of criminal recklessness.

III. Whether Means was denied effective assistance of counsel.

IV. Whether the trial court imposed an inappropriate sentence that was unsupported by aggravating circumstances.

## FACTS AND PROCEDURAL HISTORY

On the morning of July 15, 1997, a teller at the Millersville Branch of the First of America Bank in Indianapolis noticed two men squatting by a bank window. The men, who were armed and were wearing clear masks with painting at the lips and eyebrows, entered the lobby and announced to the three customers and three bank employees that they were going to rob the bank. The men ordered everyone to go into the vault area.

One of the men ordered the branch manager to fill a white trash bag with money. The branch manager took too long, and the robber himself scooped cash into the bag. When more than $83,000.00 had been bagged, the man ordered everyone to stay inside the vault. He then left along with his accomplice. Sometime during this altercation, the bank employees activated the alarm and summoned the police.

As the robbers fled the bank, they ran into Donald Edmonds, a bank customer just approaching the bank's front door. One of the robbers continued running while the second robber turned and pointed a gun at Edmonds' face. That robber, later identified as Means, threatened to shoot Edmonds and ordered him to go into the bank. Edmonds backed away and knelt down. The robbers fled to a gray minivan and entered the front seats. The robbers then pulled away from the bank in the van.

Indianapolis Police Officers James Quyle and Steve Butler heard the dispatch regarding the bank robbery and the description of the gray minivan as the getaway vehicle. The officers, in separate cars, saw the van as it proceeded away from the bank. Officer Quyle observed that two black men were sitting in the front seats of the van and that a third person appeared to be sitting in the back. Officer Quyle positioned his police car directly behind the minivan in an effort to stop the vehicle.

The minivan came to a stop, and the driver of the van exited the van and approached the police car in an "aggressive manner." The driver, armed with a silver semi-automatic pistol, fired at least three shots into the police car. Officer Quyle ducked down for safety, and when he rose he saw the driver returning to the van.

Eventually, the van turned into a residential area and pulled into the driveway of a residence where Walter Jones was sitting in his vehicle. Two men leaped from the van and fled. Means, however, exited the van, walked up to Jones' vehicle, and ordered him out the car. Means placed his left hand around Jones' neck, pressed a pistol to Jones' throat, and posi-

tioned Jones between himself and police officers who had arrived at the scene.

Means pointed his pistol at Officer Butler, who stood behind a nearby tree. Means discharged his weapon at least two times.

Means then attempted to pull Jones into his house. However, fearing for the safety of his son inside the house, Jones refused to comply. Jones told Means, "You do what you have to do, but you're not going into my home." Means told Jones, "Don't be no hero. Don't make me kill you." When Jones continued to refuse to go with him, Means gave up and laid down his gun with the additional threat to Jones that he would "get Jones and his family."

Means, and his co-defendants, Larry Parks and Ronnie Cox, were charged with numerous offenses. A jury found Means guilty of the offenses listed above and acquitted him of the attempted murder of Officer Butler. The trial court ordered Means to serve an aggregate sentence of 120 years.

On June 3, 1999, after initiating his direct appeal, Means filed a motion to dismiss his appeal and for leave to file a petition for post-conviction relief. This court granted his motion to dismiss, so that Means could raise claims of alleged ineffective assistance of counsel in a petition for post-conviction relief. The trial court denied his petition, and Means now appeals. In this appeal, Means raises issues constituting matters of direct appeal (Issues I, II, and IV) and issues pertaining to the denial of his petition for post-conviction relief (Issue III).

### DISCUSSION AND DECISION

#### I. JURY INSTRUCTIONS

##### A. Attempted Murder

■ Means was convicted as an accomplice to Parks for the attempted murder of

Officer Quyle. The crux of Means' initial argument is that the trial court's instructions failed to inform the jury that a defendant must have had the specific intent to commit murder in order to be found guilty of attempted murder. Means contends that the trial court committed fundamental error when it gave the instruction.

The trial court instructed the jury that:

A person who knowingly or intentionally kills another human being commits the crime of murder.

A person attempts to commit murder when, acting with the specific intent to commit the crime of Murder, he engages in conduct that constitutes a substantial step toward commission of Murder; which is to knowingly or intentionally kill another human being. The crime of attempted murder is a Class A felony.

To convict a defendant of Attempted Murder under Counts I and II, the State must prove each of the following elements:

1. A defendant

2. with specific intent to kill

3. engaged in conduct

4. which was a substantial step toward the commission of the crime of Murder; which is to knowingly or intentionally kill another human being.

If the State fails to prove each of these elements, you should find a defendant not guilty.

If the State does prove each of these elements beyond a reasonable doubt, you should find a defendant guilty of the crime of Attempted Murder, a Class A Felony.

(R. 106–07).

This attempted murder instruction indicates that a "knowing" mens rea is sufficient to establish guilt of attempted mur-

der. Under *Spradlin v. State*, 569 N.E.2d 948 (Ind.1991) and its progeny, this mens rea is improper. The instruction later states, however, that the State must show that the defendant acted with the specific intent to kill. The charging information read to the jury, while mentioning that murder may be committed "knowingly," states that the defendant acted with the specific intent to kill Officer Quyle.

■ The trial court should not have included the word "knowingly" in the attempted murder instruction. *See Ramsey v. State*, 723 N.E.2d 869, 872 (Ind.2000). However, defense counsel did not object to this language, and our supreme court has held under similar circumstances that the use of this type of instruction does not constitute fundamental error. *Id.* at 872–73 (citing *Yerden v. State*, 682 N.E.2d 1283 (Ind.1997); *Greenlee v. State*, 655 N.E.2d 488 (Ind.1995); *Price v. State*, 591 N.E.2d 1027 (Ind.1992)). The theory of *Ramsey* and like cases is that the instructions as a whole sufficiently suggested the requirement of intent to kill. *See Williams v. State*, 737 N.E.2d 734, 737 n. 9 (Ind.2000).

### B. Accomplice Liability

Means contends that the trial court's accomplice liability instruction failed to inform the jury that it was required to find that both the alleged shooter (Parks) and his accomplice (Means) intended the death of the victim. Means acknowledges that trial counsel did not object to the instruction or tender an alternate instruction, but he argues that the trial court committed fundamental error in giving the instruction. He cites *Bethel v. State*, 730 N.E.2d 1242 (Ind.2000), *Hopkins v. State*, 759 N.E.2d 633 (Ind.2001), and like cases in support of his argument.

In *Bethel*, our supreme court held that in order to establish that a defendant aided, induced, or caused a shooter to commit attempted murder, the State must prove that the defendant, with the specific intent that the murder occur, knowingly or intentionally aided, induced, or caused the shooter to commit the crime of attempted murder. Thus, to convict for the offense of aiding an attempted murder, the State must prove: "(1) that the [shooter], acting with specific intent to kill, took a substantial step toward the commission of murder, and (2) that the accomplice, acting with specific intent that the killing occur, knowingly or intentionally aided, induced, or caused the [shooter] to commit the crime of attempted murder." 730 N.E.2d at 1246. The court found that the evidence was insufficient to prove that the accomplice had specific intent to kill the victim or the specific intent that the shooter would kill the victim. *Id.* In *Hopkins*, our supreme court held that *Bethel* error constitutes fundamental error that is not waived by the defendant's failure to object or tender alternative instructions during trial. *Id.* at 638–40. In the later case of *Woodson v. State*, 767 N.E.2d 1022, 1029 (Ind.Ct.App.2002), *on reh'g*, 778 N.E.2d 475 (Ind.Ct.App.2002), this court held that *Bethel* error had to be addressed as fundamental error even though *Bethel* and its progeny had not been decided at the time of Woodson's trial and direct appeal.

■ In the present case, the trial court's accomplice liability instruction stated that "[a] person who knowingly or intentionally aids, induces, or causes another person to commit an offense commits that offense, even if the other person has not been prosecuted for the offense, or has not been convicted of the offense." R. 139. This instruction is erroneous under *Bethel* because it fails to inform the jury that it must find that Means acted with specific intent that a killing occur. Under *Hopkins* and *Woodson*, when intent is squarely at issue, such error is fundamental error

that is not waived by trial counsel's failure to object to the erroneous instruction.

■ The State asserts that Means may not prevail on his claim of fundamental error because the identity of the shooter and the accomplice, not intent to kill, was the real issue at trial. Our review of the trial transcript discloses that because Parks and Means wore masks at the time of the bank robbery, and because they had changed their hairstyles before trial to match the other's hairstyle at the time the offenses occurred, the issue of identity was a key emphasis throughout the trial and in both the deputy prosecutor's and defense counsel's closing arguments. Our review also discloses that the questions directed to Officer Quyle at trial by defense counsel went to the issue of identity, not intent. Furthermore, our review discloses that the deputy prosecutor made the point in closing argument that there was no real issue of intent because the shots were fired from a short distance away from Officer Quyle. Finally, while Means' defense counsel addressed the issue of intent as it pertained to the shots later fired at Officer Butler, and also made general comments about intent, counsel did not specifically address intent as it pertained to the shots fired at Officer Quyle. We conclude from our review of the transcript that both identity and intent were squarely at issue on the charge pertaining to the attempted murder of Officer Butler. Intent, however, was not at issue on the charge pertaining to Officer Quyle. Accordingly, we hold that Means has failed to establish fundamental error.

## II. CRIMINAL RECKLESSNESS

■ Means contends that the trial court committed reversible error when it refused to give a pattern jury instruction for criminal recklessness. Means' appellate counsel asserts that the instruction was sought because criminal recklessness could be found as a lesser offense on the attempted murder count pertaining to Officer Quyle. Means' trial counsel made no assertion regarding the requested instruction's relevance; however, it is clear that the instruction, if found to be a lesser included offense, would be given in relation to the attempted murder count.

The pattern instruction includes a recitation of Ind.Code § 35–42–2–2(b), which states that "[a] person who recklessly, knowingly, or intentionally performs an act that creates a substantial risk of bodily injury to another person commits criminal recklessness, a Class B misdemeanor." [However], [t]he offense is a Class D felony if it is committed while armed with a deadly weapon." The instruction further states that in order to convict a defendant of criminal recklessness as a Class D felony, the State must prove each of the following elements: 1. the defendant, 2. recklessly, knowingly, or intentionally, 3. performed an act that created a substantial risk of bodily injury to another person, 4. by using a deadly weapon. *See* Indiana Pattern Jury Instruction No. 3.15a.

■ Criminal recklessness is not an inherently included offense of attempted murder. *Ellis v. State*, 736 N.E.2d 731, 734 (Ind.2000). "As for whether criminal recklessness is a factually included offense of attempted murder, the answer may be discerned from the charging information." *Id.* (citation omitted). Criminal recklessness is not factually included when the charging information "does not include any element of reckless behavior." *Id.*

Here, the charging information stated that

DANNY E. MEANS and LARRY L. PARKS, on or about JULY 15, 1997, did attempt to commit the crime of Murder,

which is to knowingly or intentionally kill another human being, namely: OFFICER JAMES QUYLE, by engaging in conduct, that is: by shooting at and toward the person of OFFICER JAMES QUYLE, with the intent to kill OFFICER JAMES QUYLE, by means of a deadly weapon, that is: A HANDGUN, which constituted a substantial step toward the commission of the said crime of Murder."

(R. 32). Means argues that the while the State emphasized to the jury that "the shooting was done knowingly or intentionally with the intent to, kill ... Means' attorney argued that it was done recklessly, without such intent." Appellant's Brief at 23. It is clear from Means' argument that the phrase "intent to kill," as stated in the charging information, does not include recklessness as an element. Accordingly, under *Ellis*, criminal recklessness is not factually included in the attempted murder count.[1]

## III. INEFFECTIVE ASSISTANCE OF COUNSEL

Means contends that he was denied effective assistance of trial counsel. We evaluate claims pertaining to the denial of the Sixth Amendment right to effective assistance of counsel using the two-part test articulated in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). To prevail, a defendant must show both that his attorney's performance fell below an objective standard of reasonableness and that the deficiencies in the attorney's performance were prejudicial to the defense. *Id.* Prejudice exists when the conviction resulted from a breakdown in the adversarial process that rendered the result of the pro-

ceeding fundamentally unfair or unreliable. *Id.*

We need not determine whether counsel's performance was deficient before examining the prejudice suffered as a result of the alleged deficiency. *Hubbard v. State*, 696 N.E.2d 72, 74 (Ind.Ct.App.1998). Accordingly, we proceed to evaluate whether the alleged error rendered the result of Means' trial fundamentally unfair or unreliable. When making this evaluation, we consider the totality of the evidence, taking due account of the effect of the alleged error. *Id.* at 75.

### A. Failure to Request Instruction on Confinement

The information charged that Means committed the Class A felony of kidnapping when he confined Jones while "grabbing [him] and putting a gun to his head, with intent to use [Jones] as a shield or hostage." (R. 32). The information refers to Ind.Code § 35–42–3–2(a)(4), which states that the offense of kidnapping occurs when a person confines another person with the intent to use that person as a shield or hostage A "hostage" is "a person who is held as security for the performance or forbearance of some act by a third party." *Ingle v. State*, 746 N.E.2d 927, 939 (Ind.2001). A "shield" is a person who is "used to ward off some independent force." *Id.* at 937. Kidnapping most likely does not occur where "the abductor's only goal is to get the victim to do or not do something." *Id.*

Means contends that his trial counsel was ineffective in not requesting that the jury be instructed on the lesser offense of confinement. The Class D felony of confinement occurs when the defen-

---

1. In addition, we note that Means' argument on this issue is premised on his belief that his intent to kill Officer Quyle was at issue. As we stated above, intent to kill Officer Quyle was not an issue placed squarely before the jury.

dant knowingly or intentionally confines another person without the person's consent, or the defendant "removes another person, by fraud, enticement, force, or threat of force, from one (1) place to another." The offense is a Class B felony if it is committed while armed with a deadly weapon. Confinement was created by the legislature to "cover[ ] the situation where a perpetrator abducts a victim in order to induce some act or forbearance on the victim's part." *Ingle,* 746 N.E.2d at 936.

In determining whether a confinement instruction is proper, we first must determine whether the lesser confinement offense is either "inherently" or "factually" included in the kidnapping offense. *See Wilson v. State,* 697 N.E.2d 466, 473 (Ind. 1998). Our supreme court has determined that confinement is an inherently included offense of kidnapping. *Ingle,* 746 N.E.2d at 937. Our inquiry now hinges on "whether a serious evidentiary dispute exists as to which offense was committed by the defendant, given all the evidence presented by both parties." *Wilson, id.* If, in view of this dispute, a jury could have concluded that the lesser offense was committed but not the greater, then the trial court should have given an instruction on the lesser offense. *Champlain v. State,* 681 N.E.2d 696, 699–700 (Ind.1997).

In the present case, the evidence establishes that as his accomplices fled into the woods close to Jones' house, Means ran to Jones' car and ordered him to exit the vehicle. Means then dragged Jones from the vehicle, wrapped his arm around Jones' throat, and pressed a gun against Jones' throat. Means positioned Jones between himself and surrounding police officers, while yelling to the police, "Get away from me. I'll f* *king kill him. Get away." Officer Butler testified that Means yelled, "Get back. I'll f* *king shoot you and I'll f* *king shoot him." The police

officers recognized that Means was taking Jones as a hostage, and Jones understood that Means was positioning him as a shield. During this time, Means demanded that Jones take him into Jones' house and promised that he would pay Jones to help him escape. It is this demand and promise that Means characterizes as "more in line with a confinement in wanting the confined person to do something rather than a third party to do or not do something." Appellant's Brief at 28.

We conclude from the evidence that there is no serious evidentiary dispute in this matter. The evidence establishes one continuous activity by Means, which was directed toward using Jones as a shield against the surrounding police officers and effecting an escape through use of Jones as a hostage. Means' demand to enter Jones' house and offer to give him money was clearly in furtherance of Means' attempt to use Jones as a security against capture by the police officers.

Means cites *Corn v. State,* 659 N.E.2d 554 (Ind.1995) and *Correll v. State,* 639 N.E.2d 677 (Ind.Ct.App.1994) in support of his contention. In both cases, the defendant was in the process of escaping from incarceration when he confined the victims by removing them. Under Ind.Code § 35–42–3–2, a person who knowingly or intentionally confines another person with intent to obtain the release, or intent to aid in the escape, of any person from lawful detention commits kidnapping. Nevertheless, in both cases the trial court instructed the jury on the lesser included offense of confinement. The issue in both *Corn* and *Correll,* however, was not whether the confinement instruction should have been given, but whether the defendant could be convicted of confinement as a Class B felony when the charging information did not allege that the defendant used a deadly

weapon in confining the victim. *Corn* and *Correll* are inapposite.

Means was not entitled to an instruction on confinement. Consequently, his trial counsel was not ineffective in not requesting the instruction.

### B. Failure to Seek Suppression of Identification

■ After Means was arrested outside Jones' house, a police officer brought the assistant bank manager to the scene. The assistant bank manager stated that Means had a similar build to one of the robbers, but he was unable to identify Means as one of the robbers. The assistant bank manager did not identify Means at trial.

A police officer also took Edmonds to the scene for a "show up" identification. Edmonds identified Means by his build, skin complexion, and "the way he looked" as the person who had accosted him. Edmonds identified Means at trial as the person he saw at the "show up" identification.

■ While one-on-one confrontations are inherently suggestive, such confrontations are not *per se* improper. *Gray v. State,* 563 N.E.2d 108, 110 (Ind.1990). Confrontations immediately after the crime are valuable because they allow witnesses to view the suspect while the image of the perpetrator is fresh in the witness' mind. *Hill v. State,* 442 N.E.2d 1049, 1052 (Ind.1982). In fact, "the immediacy of the incident substantially diminishes the potential for misidentification." *Id.*

In the present case, the show-up identification occurred while Means was still held at the scene of his capture a short time after the bank robbery. The witnesses were brought to the scene while their perceptions were still fresh in their minds. Even had trial counsel raised a successful challenge to the show-up identification, Means would still have suffered no resulting prejudice because the outcome of his trial would not have changed. Multiple witnesses saw Means leap from the van that had been seen exiting the bank moments earlier. Inside the van, police officers discovered not only the equipment used in the robbery, i.e. masks, rubber gloves, baseball caps, and brown shirts and pants, but also the white plastic bag containing the exact amount taken from the bank. Means' prints were found inside the van and on a white plastic bag inside the van. Thus, even if counsel had successfully challenged the pre-trial identifications, the result of the trial would have been the same. There is no prejudice here; consequently, there is no basis for finding ineffective assistance of counsel.

### C. Failure to Explain Options

■ Means contends that his trial counsel was ineffective in not fully explaining the options available to him. Means testified at the post-conviction hearing that his trial counsel had informed him that the State had offered a fifty-year plea agreement. Means also testified that his trial counsel had advised him not to accept the plea because "we can do better than that by taking it to trial." (Post–Conviction Transcript at 11). Means further testified that he told his trial counsel that he wanted a "lesser plea." *Id.* Additionally, Means testified that on the day of trial his trial counsel again asked him whether he wanted to accept the plea offer. Means testified that he again rejected the plea after his trial counsel told him "I think I can win it." *Id.* at 12. Means claims that his trial counsel should have informed him that he was looking at a potential sentence of 120 years.[2]

---

2. Means' trial counsel died before the post-    conviction hearing was held.

In *Lawrence v. State,* 464 N.E.2d 1291, 1295 (Ind.1984), our supreme court considered whether trial counsel's erroneous explanation of possible penalties facing the defendant constituted ineffective assistance of counsel when the defendant ultimately rejected a guilty plea offer. The court held that the proper test is "one of reasonableness" and that "perfection" is not required. *Id.* In the present case, the record establishes that Means was advised by the trial court that he was charged with sixteen different offenses, including two counts of attempted murder and a count of kidnapping. Means admitted that he was aware that the penalty for the Class A felony of kidnapping was fifty years and that he was aware that two other charges were for Class A felonies. In his testimony, Means indicated that he was putting faith in his trial counsel's ability to contest the charges. Means stopped short of contending that he would have accepted the plea if he would have known of the possible length of the sentence he was facing. Under these circumstances, we cannot say that Means has established that counsel's performance was less than reasonable or prejudicial. Furthermore, we note that the post-conviction court was free to reject Means' self-serving claim of ignorance regarding the possible penalties. *See Weatherford v. State,* 619 N.E.2d 915, 917 (Ind.1993).

## IV. SENTENCING

The trial court sentenced Means to the maximum term of fifty years on the attempted murder and kidnapping convictions, the maximum term of twenty years on each of the four Class B felony convictions, a term of three years on the resisting law enforcement conviction, and one year on the carrying a handgun without a license conviction. The trial court ordered that the sentences on the attempted murder, kidnapping, and one of the Class B felonies be served consecutively. The total sentence is 120 years.

Our review of the sentencing hearing transcript discloses that the trial court found four mitigators. The trial court noted that Means was remorseful, that a long sentence would be somewhat of a hardship to Means' family, that Means was only twenty-six at the time the offenses occurred, and that Means had shown success in tutoring students studying to obtain a G.E.D.

The trial court found a number of aggravators. The trial court noted that Means had a prior criminal record, which consisted of a theft finding as a juvenile, a resisting law enforcement conviction, and a probation violation for failure to pay probation fees. The trial further noted as aggravators that (1) some of the victims requested that Means receive an enhanced sentence; (2) one of the victims was two years old; (3) a reduced sentence would depreciate the seriousness of the crime; (4) Means shot at police officers on two different occasions; (5) Means engaged in a planned robbery in which he confronted multiple victims; (6) Means grabbed a stranger with intent to use him as a shield; and (7) Means was "dangerous."

Means contends that the trial court erred in using "depreciation of the seriousness of the crime as an aggravator." Means also points out that the victims requesting the enhanced sentence were not the victims of either the attempted murder or the kidnapping. Means further points out that the two-year-old victim was not a victim of either the attempted murder or kidnapping convictions. Means argues that in light of the trial court's use of the erroneous and/or misapplied aggravators, a new sentencing hearing is required.

It is improper for a trial court to find as an aggravating circumstance that

the imposition of a reduced sentence would depreciate the seriousness of the crime unless the trial court is considering imposing a sentence of shorter duration than the presumptive. *Foster v. State*, 795 N.E.2d 1078, 1090 (Ind.Ct.App.2003). Here, although Means' counsel requested a minimum executed sentence, the trial court did not refer to that request or intimate that it was considering the imposition of a sentence of shorter duration than the presumptive. Instead, the trial court listed this factor as an aggravator in support of imposition of an enhanced sentence. The trial court erred in doing so.

■ In general, sentencing decisions are within the trial court's discretion and are governed by Ind.Code § 35–38–1–7.1. *Henderson v. State*, 769 N.E.2d 172, 179 (Ind.2002). We review a trial court's sentencing decisions only for abuse of discretion, including a trial court's decision to increase or decrease the presumptive sentence because of aggravating or mitigating circumstances. *Groves v. State*, 787 N.E.2d 401, 407 (Ind.Ct.App.2003), *trans. denied.*

■ Even one valid aggravating circumstance is sufficient to support an enhancement of a sentence. *Buzzard v. State*, 712 N.E.2d 547, 554 (Ind.Ct.App. 1999), *trans. denied.* When the sentencing court improperly applies an aggravating circumstance but other valid aggravating circumstances exist, a sentence enhancement may still be upheld. *Bacher v. State*, 722 N.E.2d 799, 803 (Ind.2000). This occurs when the invalid aggravator played a relatively unimportant role in the trial court's decision, and other aggravating circumstances were sufficient to sustain the trial court's decision. *Day v. State*, 560 N.E.2d 641, 643 (Ind.1990). When a reviewing court "can identify sufficient ag-

gravating circumstances to persuade it that the trial court would have entered the same sentence even absent the impermissible factor, it should affirm the trial court's decision." *Id.* When a reviewing court "cannot say with confidence that the permissible aggravators would have led to the same result, it should remand for re-sentencing by the trial court or correct the sentencing on appeal." *Id.*

■ Our review of the sentencing transcript leads us to the conclusion that the primary bases for the trial court's imposition of enhanced and consecutive sentences in this case are Means' criminal record and the particularized circumstances of the offenses committed. Although the trial court did consider an improper aggravator, the primary aggravators are sufficient to support the imposition of an enhanced sentence. Accordingly, we are confident that a remand for re-sentencing would not change the term of years imposed.

■ Finally, Means contends that his sentence is inappropriate in light of the nature of the offense and the character of the offender. Specifically, he argues that his prior criminal record is minimal, that he had maintained a relationship with his young children, and that he was described by family and friends as a "good and loving person." He further argues that although the offenses he committed were very serious, he "was certainly not the worst of offenders, nor were the offenses the worst possible." Appellant's Brief at 40.

■ A sentence authorized by statute will not be revised unless the sentence is inappropriate in light of the nature of the offense and the character of the offender. Indiana Appellate Rule 7(B).[3]

---

**3.** On July 19, 2002, our supreme court amended App.R. 7(B) and provided that the

We must refrain from merely substituting our opinion for that of the trial court. *Sallee v. State,* 777 N.E.2d 1204, 1216 (Ind. Ct.App.2002), *trans. denied.* In determining the appropriateness of a sentence in light of the "very worst offense and offender" argument, we must concentrate less on comparing the facts of this case to others, whether real or hypothetical, and more on the nature, extent, and depravity of the offense for which the defendant was sentenced, and what it reveals about the defendant's character. *See Groves,* 787 N.E.2d at 409 (citing *Watson v. State,* 776 N.E.2d 914, 922 (Ind.Ct.App.2002); *Brown v. State,* 760 N.E.2d 243, 247 (Ind.Ct.App. 2002), *trans. denied*).

In its sentencing order, the trial court noted that Means planned the robbery of the bank with total disregard for the impact his plan and subsequent actions would have on the multiple victims in the bank. The trial court also noted that it was of no consequence to Means that one of these victims was a two-year-old child. Means also entered the property of a total stranger, forced the stranger to exit his vehicle, threatened the stranger with his weapon while at the same time threatening surrounding police officers, and used the stranger as a shield. The trial court concluded that these actions were "dangerous" and that Means was a "dangerous" man. Given the use of a weapon and the randomness of the threats to innocent citizens, Means' actions had the potential to cause multiple tragedies. It is apparent that the trial court determined that Means may repeat his violent offenses with tragic consequences to innocent parties. Under these circumstances, we cannot say that the sentence was inappropriate.

amendment would be effective January 1, 2003. The rule is directed to the reviewing court and sets forth the standard for review that is in effect at the time the reviewing

## CONCLUSION

The attempted murder instruction given by the trial court, while lacking the clarity contemplated by our supreme court, did not constitute reversible error. The accomplice instruction, while erroneous, did not constitute fundamental error. The trial court did not err in refusing to instruct the jury on the lesser offense of criminal recklessness, and trial counsel's actions did not rise to the level of ineffective assistance of counsel. Finally, a remand for resentencing is not warranted, and the trial court's imposition of enhanced and consecutive sentences is appropriate.

Affirmed.

RILEY, J., and MATHIAS, J., concur.

court's decision or opinion is handed down. Although the sentence here was imposed prior to January 1, 2003, we apply the new rule.