## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Mar 31 2020, 10:34 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Elizabeth A. Bellin
Elkhart, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Samuel J. Dayton
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Michael R. Ortiz,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff.*

March 31, 2020

Court of Appeals Case No.
19A-CR-1670

Appeal from the Elkhart Circuit
Court

The Honorable Michael A.
Christofeno, Judge

Trial Court Cause No.
20C01-1709-F1-7

**Brown, Judge.**

[1] Michael R. Ortiz appeals his convictions for three counts of attempted murder as level 1 felonies. He raises three issues:

> I. Whether the evidence is sufficient to sustain his convictions;
>
> II. Whether the trial court erred by declining to provide his proposed instruction about criminal recklessness as a lesser-included offense; and
>
> III. Whether his sentence is inappropriate in light of the nature of the offenses and his character.

We affirm.

### Facts and Procedural History

[2] Formed in 2016, Sinland is an organization comprised of individuals who "love to ride motorcycles."[1] Transcript Volume IV at 175. After bringing Sinland to Elkhart, Indiana, from the California-based mother chapter, "Sinland IE" or "Inland Empire," Ortiz served as the president of the Elkhart chapter and recruited new members. *Id.* at 243.

---

[1] A tightknit group "like family," Sinland has requirements to become a member, as well as its own clothing, patches, and "saying," which proclaims:

> Bikers know they don't live forever. Each day they ride, they take a stand for their personal freedom. It's how they hold their ground. Bikers don't allow others to decide who and what they are. They're bikers.

Transcript Volume IV at 245-246.

[3] Ortiz's friend for ten years, Jimmie Lawson, began a relationship at some point with Linsey Hinegardner.[2] Her then-husband, John Hinegardner, verbally confronted Lawson about the relationship once but left following a brief exchange, and he contacted Lawson's ex-wife and discussed the relationship.

[4] Following their divorce, "it was like a light switch turned off" between John and Linsey. Transcript Volume III at 9. A couple of days before June 17, 2017, John's nephew, Dustyn Knisley, drove him to a house on Rogers Road at which John and Linsey had lived and which she was awarded in the divorce, and they sought to retrieve a truck he had been awarded. The truck had motor issues, and John and Knisley planned to "tow chain it off the property." *Id.* at 18. John knocked on the door and told Linsey he was there to retrieve the truck, Linsey disputed his claim to it and "kind of went off," and John left. *Id.* John and Knisley returned a second time and obtained permission from Linsey's neighbor to drive through his property and access the truck. As John attached jumper cables, Linsey emerged from the house with "some kind of, like, a butter knife or steak knife," stated she was "gonna stab the tires and all that," and was "on the phone the whole time, texting, calling people." *Id.* at 20-21. After Linsey "coldcocked [John] in the head," Ortiz, who John had never previously met, pulled in and exited his vehicle, John and Knisley left in

---

[2] At trial, Linsey was often referred to by her maiden name, Linsey Vanator.

Knisley's vehicle without obtaining the truck, and John watched Ortiz stand "at the end of the driveway with Linsey as [they] drove by."[3] *Id.* at 21.

[5] On June 17, 2017, Lawson was "patched in" as a member of Sinland, an event which was a "big deal." Transcript Volume IV at 245. During the late afternoon of the same day when it was light out, John drove Knisley's truck, with Knisley in the passenger seat and John's friend, Sarah Marchbanks, in the rear passenger seat, to the New Paris Speedway racetrack. Passing a tavern, John saw motorcycles "on the right-hand side sitting there on the side of the road" and commented to Knisley that a man who stood by them looked like Lawson. Transcript Volume III at 34. He looked in his rearview mirror and saw "all these other bikes take off" and begin "chasing [Knisley's truck] down." *Id.* Approximately six motorcycles drove around the truck, and John saw from a distance of "10, 12 feet" Ortiz remove a gun with his right hand as he passed in the passing lane as the lead motorcyclist, place it between his legs, and "throttle[] on."[4] *Id.* at 36-38. Ortiz was without a helmet and wore a Sinland vest. Lawson and Linsey rode together on the rear motorcycle.

[6] John noted Ortiz's gun and slowed and stopped the truck. The motorcyclists stopped and gathered at the intersection beyond where the truck had stopped,

---

[3] John and Knisley later returned to the house a third time, successfully recovered the truck, and noticed a broken rear window and that the ignition switch "had been broken out of" it – damage of which John had been previously unaware. Transcript Volume III at 92.

[4] At trial, Ortiz testified he was "in the lead," or front, and stated, "Because I'm the president," in response to follow-up questioning. Transcript Volume IV at 248.

"five of the bikes came back towards the truck," and "[o]ne bike stayed back." *Id.* at 42. Traffic could not "get through" the two-lane road because of the placement of the motorcycles which were in front of the truck and off to the side. *Id.* at 70. Lawson and Linsey stopped their motorcycle right next to the truck, Linsey started "hollering," and John told Marchbanks to call 911 so he could "focus on what was going on." *Id.* at 42, 72. Ortiz, who had parked at the intersection, heard the argument and raised his hands and a gun in the air. A motorcyclist positioned a bike "into the front of [the] truck from blocking it from . . . running," and another was on the side. *Id.* at 112.

[7] Indicating to Knisley, "Hold on" and "We're out of here," John drove around the bike in front of the truck. *Id.* at 42. "[S]cared a little bit," he drove down into a drainage ditch and back onto the road. *Id.* at 73. Ortiz "took off" driving in the direction of the truck in the opposite lane of traffic. *Id.* at 43. John saw Ortiz pull his gun up and yelled, "Gun," and Marchbanks looked at Ortiz directly in the face. *Id.* All three occupants of the truck ducked, Ortiz fired his gun "nine or ten" times as they went by, and John "kept [the truck] straight" and did not cross the center line of the road. *Id.* at 46, 113. A bullet entered through the open driver's window and "went through the headrest in the passenger seat," and another bullet "went through [Marchbanks's] ponytail" but otherwise missed her. *Id.* at 178. Ortiz and the motorcyclists fled the scene.

[8] John turned the truck through the intersection and turned off the engine which was leaking antifreeze and transmission fluid. John, Knisley, and Marchbanks did not leave the scene and spoke with law enforcement when they arrived.

Meanwhile, Ortiz and the motorcyclists returned in a "very aggressive, very fast" pace to the house of an individual named Mike Weaver, placed a "whole bunch" of motorcycles in the garage as they pulled into the driveway, placed those that could not fit around the back of the garage, and removed and left the vests they wore in the garage. Transcript Volume IV at 46.

[9] Reporting to the scene, Elkhart County Sheriff's Officer Jay Peterson observed seven "defects that were consistent with projectiles passing through the body of the truck," photographed the truck's exterior and interior, and collected projectiles. Transcript Volume II at 200. Elkhart County Sheriff's Patrolman Jesse Reust located four shell casings in a line west of the intersection, "as if they had been moving down the roadway" within "probably 10, 15 yards of each other." *Id.* at 221-222.

[10] On September 19, 2017, the State charged Ortiz with three counts of attempted murder as level 1 felonies. At the jury trial, the court admitted Officer Peterson's photographs illustrating the truck's defects as State's Exhibits 2-31. Forensic specialist Randy Mockler testified that he conducted a shooting reconstruction on the truck to determine the directionality of the rounds fired and the possible distance from the truck when fired, the court admitted photographs documenting his investigation as State's Exhibits 93-130, and Mockler testified about the

reconstruction analyses conducted on the truck.[5] Knisley testified he had seen Ortiz once prior to the shooting at "the house off of Rogers Road" and answered affirmatively when asked if he "g[o]t a clear look" at the person who fired the shots. Transcript Volume III at 89, 113. He indicated his mental state for the two months following the incident was "pretty erratic" and that he suffered sleepless nights. *Id.* at 116. During cross-examination, Marchbanks answered, "Difficult," when asked whether the tint on the windows in Knisley's truck made it either difficult or impossible for someone standing outside to see inside and determine if somebody was seated in the vehicle. *Id.* at 192. When asked if she recalled making any sort of visual eye contact with the individual that was holding the gun, she stated: "Before I ducked, I remember looking him right in the face." *Id.* at 203. During his testimony, Ortiz described the truck's movement and indicated that, by the time the truck "comes out the ditch" and was "back on pavement," "we're side by side." Transcript Volume IV at 235.

[11] After the defense rested, Ortiz's counsel indicated she requested an instruction

> on the lesser-included Criminal Recklessness as a Level 6 Felony.
> The Court has declined to give that instruction. I had previously
> indicated I do believe that Criminal Recklessness as a Level 6

---

[5] Specifically, Mockler referenced State's Exhibits 125 and 126, photographs of a "placard F" that identified a "perforation that went into" the side of the truck's bed and exited the bed's front, and indicated that the projectile had a right-to-left trajectory which was "not quite straight on" and was "82 degrees off center" and had a downward angle of three degrees. Transcript Volume IV at 74. Referencing State's Exhibits 127 and 129, photographs of "G . . . a hole made by a projectile towards" the back of the bed and "showing G with a trajectory rod . . . showing the path" of the bullet's trajectory, he testified that the projectile had a forty-nine degree right-to-left trajectory and a slight upward angle of one degree. *Id.* at 75. He explained that State's Exhibit 118 was a photograph of an area of trajectory made by a projection that went through the front passenger-side headrest.

would be a factually included lesser offense of this charge. I've requested that on the basis of *Jones v. State*.[6]

Transcript Volume V at 17. The court indicated that, were it to give a lesser-included instruction, "it would be Criminal Recklessness as a Level 5 Felony because the theory . . . would be that the defendant fired the firearm into a vehicle which, under the statute, is a place," *id.* at 18, and declined to provide the instruction, relying on *Means v. State*, 807 N.E.2d 776 (Ind. Ct. App. 2004), *trans. denied*, and *Ellis v. State*, 736 N.E.2d 731 (Ind. 2000).

[12] The jury found Ortiz guilty as charged. At sentencing, Ortiz's counsel argued Ortiz never denied he was the individual who fired the shots and he "simply believed that he had legal justification to do so" via self-defense, his criminal history appeared to have ended thirteen years ago when he "started focusing on . . . having a family," and that his biggest source of distress is the notion of his family struggling without him being the bread winner. Transcript Volume V at 76. Ortiz stated he accepted responsibility for what he did, he wanted the "people in the truck to know" that he "would never kill them, hurt them," he did not know them, and he was sorry "to everybody in Indiana." *Id.* at 84.

[13] The court found as mitigating the circumstances described in the argument from Ortiz's counsel and the statements from Ortiz.[7] It found as aggravating:

---

[6] In his brief, Ortiz cites *Jones v. State*, 868 N.E.2d 1205 (Ind. Ct. App. 2007), *trans. denied*.

[7] The court mentioned it found some of Ortiz's statements more mitigating than others.

Ortiz's prior criminal history which, by its review of the presentence investigation report ("PSI"), included "two prior misdemeanor convictions and five prior felony convictions, one probation violation, and three parole violations"; the fact he was president of the Elkhart chapter of Sinland motorcycle club, "which . . . acted much more like a gang than a charitable organization set up to assist those less fortunate"; his drug use, which included separate offenses related to usage of marijuana as a teenager and reported usage of marijuana and methamphetamine in the past and last in 2006; that he could have avoided the situation had he been home with his family; that, as president, he could have intervened and prevented the entire confrontation and "the gang behavior . . . in surrounding the truck"; his possession of a firearm for which he did not have a license; and that he fired seven shots, including three shots "fired back towards the cab of the truck" after he passed it. *Id.* at 86-88. The court also noted: as a supplemental factor, the IRAS score placed Ortiz in the moderate risk to reoffend category; other sanctions – including court costs, fines, suspended jail sentences, probation, short jail sentences, short prison sentences and parole – proved to be unsuccessful; he shot at the truck and "continued to shoot at it while [John] was trying to escape from the threat posed by the motorcycle gang"; and he minimized the shooting and, in doing so, failed to accept responsibility, "just like [he] failed to stay and accept responsibility at the scene." *Id.* at 88. The court found the aggravators, taken individually or as a whole, outweighed any mitigating factors, and it sentenced him to thirty-seven years with two years suspended for each count of attempted

murder, to be served consecutively, for an aggregate executed sentence of 105 years.

## *Discussion*

## I.

[14] The first issue is whether the evidence is sufficient to sustain Ortiz's convictions. When reviewing claims of insufficiency of the evidence, we do not reweigh the evidence or judge the credibility of witnesses. *Jordan v. State*, 656 N.E.2d 816, 817 (Ind. 1995), *reh'g denied*. Rather, we look to the evidence and the reasonable inferences therefrom that support the verdict. *Id.* We will affirm the conviction if there exists evidence of probative value from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. *Id.*

[15] The offense of attempted murder is governed by Ind. Code § 35-42-1-1 and Ind. Code § 35-41-5-1. To convict a defendant of attempted murder, the State must prove beyond a reasonable doubt that the defendant, acting with the specific intent to kill, engaged in conduct which constitutes a substantial step toward the commission of murder. *Mitchem v. State*, 685 N.E.2d 671, 676 (Ind. 1997). A "substantial step" toward the commission of a crime, for purposes of the crime of attempt, is any overt act beyond mere preparation and in furtherance of intent to commit an offense. *Hughes v. State*, 600 N.E.2d 130, 131 (Ind. Ct. App. 1992). Whether a defendant has taken a substantial step toward the commission of the crime is a question of fact to be decided by the trier of fact

based on the particular circumstances of the case. *Id.* "Intent may be inferred from the use of a deadly weapon in a manner likely to cause death or great bodily harm." *Noble v. State*, 725 N.E.2d 842, 845 (Ind. 2000). *See also Corbin v. State*, 840 N.E.2d 424, 429 (Ind. Ct. App. 2006) ("[D]ischarging a weapon in the direction of a victim is substantial evidence from which the jury could infer intent to kill.") (quoting *Leon v. State*, 525 N.E.2d 331, 332 (Ind. 1988)). A conviction may be based on circumstantial evidence alone. *Fry v. State*, 885 N.E.2d 742, 750 (Ind. Ct. App. 2008), *trans. denied*.

[16] In his brief, Ortiz concedes he "opened fire on the vehicle," but he maintains that he fired his weapon based on a belief that John was either going to run him or another motorcyclist over with his truck. Appellant's Brief at 9. He argues he lacked the requisite *mens rea* for a conviction in all three counts, contends no testimony demonstrated he knew when he fired his weapon that more than one person occupied the truck, and asserts that his belief he was acting in self-defense his testimony that he had never previously seen John, Knisley, or Marchbanks, negated a specific intent to kill.

[17] The State argues Ortiz waived any separate legal issue of whether it had failed to rebut a self-defense claim because he does not advance cogent argument supported by citations to appropriate legal authority. It contends that, waiver notwithstanding, he cannot demonstrate his actions were justified since he: blocked the proper flow of traffic; participated in the confrontation and intimidation of John and removed his gun as he passed the truck; and continued firing after the danger passed and when, according to his testimony,

he was "side by side" with the truck. Appellee's Brief at 25 (quoting Transcript Volume IV at 231). In maintaining he acted with the requisite specific intent, the State points to the fact that he fired his gun as many as ten times, and contends that the forensic examination of the bullets' trajectories supports a finding that he adjusted the angle of his gun toward the truck's cabin as it accelerated to safety; that is, besides a "few shots on the front," the rest of the bullets were fired into the truck's side around passenger-level. *Id.* at 22. It further contends the jury could reasonably have concluded Ortiz saw the truck's three occupants when he initially passed within feet of it or shot at it while he was side-by-side with it and, pointing to State's Exhibit 3, a photograph of Knisley's truck, claims that the "landscape on the other side of the truck" can be seen clearly even when viewed through as many as two of the truck's tinted windows. *Id.*

[18] The evidence shows that Ortiz, driving in the opposite lane of traffic, rode toward the truck that John, Knisley, and Marchbanks occupied and which he had previously driven past at a distance not greater than twelve feet, and as the truck attempted to leave the area Ortiz fired at it a total of nine or ten times, continuing to fire even as he passed it. One of the bullets entered John's open window and struck Knisley's headrest and another of the bullets struck Marchbanks's ponytail. To the extent Ortiz suggests there was no evidence he knew that three individuals occupied vehicle, we note that Ortiz passed John's vehicle in the passing lane at no more than twelve feet, John's driver side window was open, John saw Ortiz pull the gun up, Marchbanks looked at Ortiz

directly in the face before she ducked, Ortiz's view was not obstructed by a helmet, he was side-by-side with John's vehicle when he fired some of the shots, and, while the windows were tinted, the photographs admitted at trial showed the windows were not so tinted as to conceal a person. Ortiz's arguments are invitations to reweigh the evidence, which we cannot do. *Id.*

[19] We conclude that the State presented evidence of probative value from which a reasonable jury could have determined beyond a reasonable doubt that Ortiz was guilty of three counts of attempted murder. *See Cook v. State*, 675 N.E.2d 687, 692 (Ind. 1996) (holding that the evidence was sufficient to sustain the defendant's conviction for murder despite the defendant's argument that he did not intentionally shoot at the victim); *Maxwell*, 731 N.E.2d 459, 462-463 (Ind. Ct. App. 2000) (holding that the evidence was sufficient to sustain the defendant's conviction for attempted murder where he pointed and shot his .44 caliber handgun at two victims at close range), *trans. denied*.

## II.

[20] The next issue is whether the trial court erred by declining to provide Ortiz's proposed instruction about criminal recklessness as a lesser-included offense. We apply a three-step analysis in determining whether a defendant was entitled to an instruction on a lesser-included offense. *See Wright v. State*, 658 N.E.2d 563, 566-567 (Ind. 1995). We must determine: (1) whether the lesser-included offense is inherently included in the crime charged; if not, (2) whether the lesser-included offense is factually included in the crime charged; and, if either, (3) whether there

is a serious evidentiary dispute whereby the jury could conclude the lesser offense was committed but not the greater offense. *Id.* If the "jury could conclude that the lesser offense was committed but not the greater, then it is reversible error for a trial court not to give an instruction, when requested, on the inherently or factually included lesser offense." *Id.* at 567. When the trial court makes a finding that a serious evidentiary dispute does not exist, we will review that finding for an abuse of discretion. *Brown v. State*, 703 N.E.2d 1010, 1019 (Ind. 1998). However, if a trial court rejects a tendered lesser-included offense instruction on the basis of its view of the law, as opposed to a finding that there is no serious evidentiary dispute, appellate review of the ruling is *de novo*. *See White v. State*, 849 N.E.2d 735, 739 (Ind. Ct. App. 2006) (citing *Brown*, 703 N.E.2d at 1019), *reh'g denied*, *trans. denied*.

[21] Arguing criminal recklessness is an inherently lesser-included offense of murder, Ortiz cites *Miller v. State*, 720 N.E.2d 696 (Ind. 1999), for the proposition that culpability is the only element distinguishing the crimes of criminal recklessness and murder. He also argues criminal recklessness, in this instance when he "asserted the [sic] he acted in self-defense, and the trial court provided the jury with a self-defense instruction," was a factually included offense of the charge of attempted murder, and contends that the court should have proceeded to the third step of the *Wright* analysis. Appellant's Brief at 19. The State argues criminal recklessness was not an inherently or factually-included offense and maintains the trial court did not need to have proceeded to the third step of the *Wright* analysis.

[22] It is well-established in Indiana that criminal recklessness is not an inherently included offense of attempted murder. *Ellis*, 736 N.E.2d at 734. However, whether an offense is a factually lesser-included offense of another offense requires a case-by-case determination. *White*, 849 N.E.2d at 739. "As for whether criminal recklessness is a factually included offense of attempted murder, the answer may be discerned from the charging information." *Ellis*, 736 N.E.2d at 734 (citation omitted). Criminal recklessness is not factually included when the charging information "does not include any element of reckless behavior." *Id.*

[23] In *Ellis*, the defendant was charged with attempted murder as follows: "Ellis did attempt to commit the crime of Murder by knowingly or intentionally firing a deadly weapon at and against the person of [the victim], which conduct constituted a substantial step toward the commission of the crime of Murder [.]" *Id.* at 735. The Indiana Supreme Court held that because the attempted murder charge "did not include any element of reckless behavior, [criminal recklessness] was not factually included in the crime charged." *Id.* (citing *Wilson v. State*, 697 N.E.2d 466, 477 (Ind. 1998), *reh'g denied*).

[24] In the instant case, the information charging Ortiz with attempted murder provides, in pertinent part: "MICHAEL R. ORTIZ, with the specific intent to commit the crime of murder, that is to intentionally kill another human being, to wit: John Hinegardner, Jr., did engage in conduct that constituted a substantial step towards the commission of said murder . . . ." Appellant's Appendix Volume II at 16. *Accord id.* (alleging in the other two counts the same

against Ortiz with regard to Knisley and Marchbanks).  This information, like the information in *Ellis*, includes no element of reckless behavior.  Therefore, we find that criminal recklessness was not factually included in the attempted murder charge.[8] *See White*, 849 N.E.2d at 740; *Ellis*, 736 N.E.2d at 735.  The trial court did not err in refusing to instruct the jury on criminal recklessness because it was neither inherently nor factually included in the crime charged.

## III.

[25]    The next issue is whether Ortiz's sentence is inappropriate in light of the nature of the offenses and his character.  Under Ind. Appellate Rule 7(B), the burden is on the defendant to persuade the appellate court that his or her sentence is inappropriate.  *See Childress v. State*, 848 N.E.2d 1073, 1080 (Ind. 2006).  Relief is available if, after due consideration of the trial court's sentencing decision, this court finds that in our independent judgment, the sentence is inappropriate in light of the nature of the offense and the character of the offender.  *Hines v. State*, 30 N.E.3d 1216, 1225 (Ind. 2015).  "[S]entencing is principally a discretionary function in which the trial court's judgment should receive considerable deference."  *Id.* (quoting *Cardwell v. State*, 895 N.E.2d 1219, 1222

---

[8] To the extent Ortiz cites to *Jones v. State*, 868 N.E.2d 1205 (Ind. Ct. App. 2007), *trans. denied*, we observe that, in Jones's case, "specific intent to kill" appeared nowhere in the final instructions provided to the jury which stated "that if the State proved that while acting with the 'specific attempt' to kill Douglass, Jones did attempt to kill him, which was a substantial step toward the commission of the 'intended crime' of killing Douglass, then the jury could convict Jones of attempted murder." *Jones*, 868 N.E.2d at 1210.  Unlike in *Jones*, the trial court here instructed the jury that the State must prove Ortiz acted with the specific intent to kill each of the vehicle's occupants.

(Ind. 2008)). Deference to the court's decision "should prevail unless overcome by compelling evidence portraying in a positive light the nature of the offense (such as accompanied by restraint, regard, and lack of brutality) and the defendant's character (such as substantial virtuous traits or persistent examples of good character)." *Stephenson v. State*, 29 N.E.3d 111, 122 (Ind. 2015). "[W]hether we regard a sentence as appropriate at the end of the day turns on our sense of the culpability of the defendant, the severity of the crime, the damage done to others, and myriad other factors that come to light in a given case." *Hines*, 30 N.E.3d at 1225 (quoting *Cardwell*, 895 N.E.2d at 1224).

[26] Ortiz argues, as he did in Part I, that he believed he was acting in self-defense. He argues "there was no one hit with a bullet" that he fired, he did not know any of the individuals in the vehicle, and there was nothing notably distinguishable about the nature of the offense to justify the aggravated sentence. Appellant's Brief at 22. He also argues he was gainfully employed, was married for ten years, and had four children at the time of the incident; he and Lawson both described the motorcycle club of which he was president as a charitable organization; and he apologized to the victims.

[27] Our review of the nature of the offenses reveals that the shooting incident began when Ortiz, wearing a Sinland vest and as the group's president, led approximately six motorcyclists, including Lawson and Linsey, in "chasing . . . down" a truck that Linsey's ex-husband, John, drove with his nephew and friend as passengers. Transcript Volume III at 34. As Ortiz passed the truck in the adjacent passing lane, he removed and placed a gun in between his legs, and

John noted the gun and stopped the truck. The motorcyclists gathered at the following intersection and blocked traffic. Ortiz raised his hands and a gun in the air when Linsey began "hollering," and a motorcyclist positioned a bike to inhibit the truck's escape. *Id.* at 42. As John attempted to drive away, Ortiz rode toward and fired nine or ten times at the truck, and bullets struck the front passenger headrest and Marchbanks's ponytail. Afterwards, Ortiz and the other motorcyclists hid their motorcycles and removed and left their vests. Knisley testified his mental state after the incident was "pretty erratic" and that he suffered sleepless nights. *Id.* at 116.

[28] Turning to Ortiz's character, we note his involvement as president of, and in recruiting new members to, the Elkhart, Indiana chapter of Sinland, a motorcycle group which the trial court found acted more like a gang than a charitable organization. We observe that Ortiz admits to bringing Sinland to Indiana from California. The PSI indicates Ortiz's juvenile history includes a 1996 delinquent act in California for "Warrant – Vehicle Theft," for which he reported he had been detained but not formally charged. Appellant's Appendix Volume II at 99. His adult criminal history began in California and includes charges in 2000 for "Possess/Mfg/Sell Dangerous Weapon/Etc., Felony" and "Obstruct Public Officer/Etc, Misdemeanor," convictions in 2001 for a "Possess/Mfg/Sell Dangerous Weapon/Etc., Misdemeanor" and driving without a license as a misdemeanor, a conviction in 2001 for vehicle theft as a felony, a probation revocation and sixteen month prison sentence in 2001 related to charges for "Make/Pass Fictitious Check, Felony" and "Receive/Etc.

Known Stolen Property, Felony," convictions in 2006 for vehicle theft as a felony, possession of a firearm as a felon, a felony, and possession of controlled substance for sale as a felony, and two separate charges in 2008 and a charge each in 2009 and 2011 for violation of parole as a felony. *Id.* at 99-100. The PSI indicates he was "[r]eceived at Institution for men in Chino, California" in February 2008 and February 2009. *Id.* at 100, 101. In the Substance Abuse section, it states he reported trying marijuana as a teenager and that, according to the "Bond Report, [he] reported using marijuana and methamphetamine in the past and that he last used them in 2006." *Id.* at 103.

[29] After due consideration, we cannot say that Ortiz has sustained his burden of establishing that his aggregate sentence is inappropriate in light of the nature of the offenses and his character.

## *Conclusion*

[30] For the foregoing reasons, we affirm Ortiz's convictions and sentence for three counts of attempted murder as level 1 felonies.

[31] Affirmed.

Najam, J., and Kirsch, J., concur.